UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | |
| CHARLES R. ROSE CH: 11 | ) | 2:07-BK-05284-EWH |
| TRIAL ON COMPLAINT | ) | ADV: 2-08-00033 |

U.S. Bankruptcy Court
230 N. First Avenue, Suite 101
Phoenix, AZ 85003-1706

May 27, 2010
1:30 p.m.

BEFORE THE HONORABLE EILEEN W. HOLLOWELL, Judge

APPEARANCES:

| | |
|---|---|
| Plaintiff (Pro Se): | Derrick Collins<br>Shirley Collins<br>2243 N. El Sereno<br>Altadena, CA 91001 |
| For Charles R. Rose (Defendant): | Allan D. NewDelman<br>ALLAN D. NEWDELMAN PC<br>80 E. Columbus Ave.<br>Phoenix, AZ 85012 |

Proceedings recorded by electronic sound technician, Kayla Morgan; transcript produced by AVTranz.

INDEX


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Charlie Rose | | | | |
| (By Mr. Collins) | 17 | | | |
| (By Mr. NewDelman) | | 123 | | |
| (By Mr. Collins) | | | 141 | |
| (By Mr. NewDelman) | | | | 142 |
| (By Mr. Collins) | | | 145 | |
| Emmanuel Illuminardi | | | | |
| (By Mr. NewDelman) | 45 | | | |
| (By Mr. Collins) | | 81 | | |
| (By Mr. NewDelman) | | | 87 | |
| Derrick Collins | | | | |
| (Testimony) | 90 | | | |
| (By Mr. NewDelman) | | 112 | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| A | 12 | 13 |
| C | 12 | 13 |
| F | 12 | 13 |
| I | 12 | 13 |
| 4 | 21 | 25 |
| 5 | 29 | 29 |
| 16 | 30 | 31 |
| 18 | 34 | 35 |
| 17 | 39 | |
| 7 | 42 | 110 |
| 14 | 43 | |
| 15 | 44 | |
| B | 60 | 61 |
| G | 72 | 73 |
| H | 76 | 76 |



AVTranz
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

THE CLERK: All rise.

THE COURT: Good afternoon. Please have a seat.

THE CLERK: BK 07584. Charlie R. Rose. Adversary 08-033.

THE COURT: Appearances please. Plaintiff first.

MRS. COLLINS: In appearance today, myself, Shirley Collins, and Derrick Collins.

THE COURT: Mr. NewDelman.

MR. NEWDELMAN: Good afternoon, Your Honor. Allan NewDelman on behalf of Charlie Rose, who's in the courtroom with us.

THE COURT: Okay. This is a Plaintiff complaint for non-dischargeability. The Plaintiff has the burden of proof. Any opening statements?

MRS. COLLINS: Yes, I do have an opening statement, Your Honor, if I may.

THE COURT: Okay. You have to stand at the podium in federal court.

MRS. COLLINS: Oh, okay. Good afternoon, Judge Howell. In appearance for the Plaintiffs is I, Shirley Collins, and Derrick Collins. We are representing ourselves this afternoon in this case against the Defendant, Charles Rose, for fraudulent transactions between Rose and Derrick. I will do my best to present all of my evidence as clearly as I can and follow the Court's rules to the best of my ability.

Very briefly, I will go over the witness you will hear from and documents I plan to introduce into evidence to give you an idea of what the case is all about in a nutshell.

In December of '06, Charlie Rose and Emmanuel Illuminardi signed into agreement by the way of a promissory note with real property described -- with a real property deed described and attached. Both the deed and the note were given to Derrick as collateral in return for a loan of 100,000. In return, Derrick was to return back -- was to be given back 150 in a six-month period of time. The loan of the money was presented to him and propositioned to him by Charles Rose and Emmanuel Illuminardi. This transaction was solicited through Mac McDaniels, who is our accountant and does our tax returns for the last five years.

Derrick relied and trust (sic) on McDaniels' words and the documents that were given to him from Emmanuel and Rose to be true and correct.

Derrick will testify that after April 2007 when the money was not paid back, he never received a payment from Rose or Illuminardi and neither Rose nor Illuminardi ever tried to make contact to Derrick for repayment or any communication to Derrick after receiving the money, nor proof of an investment never came to surface after Derrick gave the money to Illuminardi and Rose.

After receiving no contact from Rose or Illuminardi,

Derrick continually contacted Mr. McDaniels regarding the payback of the money from Rose and Illuminardi. After no response from Rose or Illuminardi, I, Shirley Collins, proceeded to investigate the trueness of the documents that were given to Derrick, only to learn that the deed that was given to Derrick is completely bogus and that in fact absolutely has -- that Derrick has in fact absolutely no collateral for his $100,000 loan.

In September of '07, I filed a criminal with the Los Angeles County Sherriff Department. In October of '07 Rose filed for bankruptcy. As a result of my discovery, along with my most recent discoveries, I have learned that not only did Emmanuel Illuminardi and Rose or others not have any rights or titles to the deeded land, but as well, they were already set in place a cease and desist order to Charles Rose and others regarding that very same land that was deeded to Derrick. The order was dated to Rose before the time that Derrick went into this agreement is currently documented with the Imperial County Assessor's Recorder -- the Imperial County Recorder's office, which was submitted before Derrick's transaction to Rose and Illuminardi.

Mr. Rose and others have created wild (sic) deeds on the land to which they have never owned the title or have encumbered.

My evidence today is notarized documents from the

Imperial County -- certified copies, let me correct that, from the Imperial County Recorder's and Assessor's office. These documents are true to the fact and are recorded with the government recorder and assessor's agency. All the information is public.

Your Honor, after hearing all the evidence today, I hope that you will rule that the Defendant in fact committed fraud and award our non-dischargeable debt along with expenses, general lien, and/or injunctions on all assets, bank accounts, the allowed state interest on the money that was took, and any other tangible things against Mr. Rose in order to recover our money that was took from Derrick and our children.

THE COURT: Thank you. Mr. NewDelman, any opening statement?

MR. NEWDELMAN: My first comment to the opening statement of Mrs. Collins is that she's not the Plaintiff in the lawsuit. It's Derrick Collins, for what it's worth. And she's not a licensed attorney. So I'm not sure how we're going to do this. I know we wanted to get it over with and whatnot. She seems to be the family spokesperson. But in reality, she's not a Plaintiff in the lawsuit. So, I don't know what -- I mean, I heard her opening statements. We -- the burden is on the Plaintiff, I agree --

THE COURT: Ms. Collins, your husband is appearing in pro se. All of the documents were signed by your husband.

Correct?

MRS. COLLINS: Yes, they were. And all the discovery was made by me.

THE COURT: Well, it doesn't matter whether it was made by you. The point is, your husband can proceed. But I don't know that you can represent your husband. You're not a lawyer.

MRS. COLLINS: Right.

THE COURT: So I know you're prepared to present the case. But what Mr. NewDelman has raised is your right to represent your husband. And I'm struggling to understand all the transactions involved your husband. Was he dealing with community assets? Does the $100,000 lent to the Debtor the family money or your husband's sole and separate property?

MR. COLLINS: Yes, sir -- yes, ma'am.

THE COURT: Yes, ma'am, one or the other, sir.

MR. COLLINS: It was an inheritance from my grandfather.

THE COURT: So it's his sole and separate property. Okay. So, Mr. NewDelman, you object to allowing Debtor's (sic) wife to present the case, I take it?

MR. NEWDELMAN: Yes. And I move to strike the opening statement.

MRS. COLLINS: Your Honor, can we rebut that? Derrick and I have investigated this case together.

THE COURT: Ms. Collins, it isn't a question of what you've done together. It's that a person can represent themselves in court. But what a person cannot do is have another non-lawyer represent them. You're not an attorney authorized to practice in Arizona, are you?

MRS. COLLINS: No, I'm not.

MR. COLLINS: No, I'm not.

THE COURT: Okay.

MR. COLLINS: So --

THE COURT: I don't --

MR. COLLINS: -- well, how do we proceed?

THE COURT: Mr. Collins can present his case. And the opening statement -- I'm not going to strike the opening statement, Mr. NewDelman --

MR. NEWDELMAN: Thank you.

THE COURT: -- it doesn't make any difference. I can -- Mr. Collins, if that had been -- would you adopt the same statement your wife just made?

MR. COLLINS: Yes, ma'am.

THE COURT: Okay. Really, Mr. NewDelman, you should have stood --

MR. NEWDELMAN: I agree.

THE COURT: -- up and made the objection before the opening statement was made. So the opening statement stays on the record.

MR. COLLINS: Thank you.

THE COURT: But going forward, Mr. Collins, you're going to have to try to --

MR. COLLINS: I'll try to -- I'll try to proceed --

THE COURT: You know, you'll get up here and --

MR. COLLINS: -- as best as I can.

THE COURT: -- and testify --

MR. COLLINS: Yes, ma'am.

THE COURT: -- on behalf of yourself.

MR. COLLINS: Yes, ma'am.

THE COURT: And you will cross-examine the witnesses. Okay? And I understand it's going to be very difficult, Mrs. Collins, for you not to participate. But while you can give your husband advice --

MR. COLLINS: That's what I was getting ready to ask. Can she give me advice?

THE COURT: You may confer with your wife --

MR. COLLINS: Yes, ma'am.

THE COURT: -- absolutely. But she may --

MR. COLLINS: That would be fine.

THE COURT: -- not ask the questions and she may not present the evidence.

MR. COLLINS: That's fine. But she can ask the questions down and I can answer it myself?

THE COURT: What you do between the two of you is not

something that I care about.

MR. COLLINS: Thank you, ma'am. I'll accept that.

THE COURT: You know --

MR. COLLINS: Thank you.

THE COURT: -- I mean, Mr. NewDelman's motion is granted that the only person who is appearing here in pro per is Mr. Collins.

MR. NEWDELMAN: And I've tried to work with the Collins to get them to this point of being able to present their evidence today. In defense, in the opening statement simply put is that my client does not disagree at all that he signed a $150,000 promise to pay Derrick Collins on an investment that Derrick Collins made to a company known as Gibraltar. He was an accommodating party. He was a fool with a fountain pen. Actually there are two signatories on the promissory note.

But Mr. Collins had nothing to do with the pledge of any property. That property that was purportedly pledged was property of Gibraltar. Mr. Rose does not own, never did nor ever represented that he ever owned -- to anybody -- any property in Imperial County, California. He does not. Never made the representation.

When the money was transferred, and the date on that was December 15th of 2006, the date of the Note is December 14th, 2006, Mr. Collins was not present. The deal came through

simply by the Collins -- Mr. Collins' agent, Mac McDaniel, who's apparently not here today to testify. And the other people present was Mr. Thompson, who's the primary officer of Gibraltar properties, Emmanuel Illuminardi, who's the other co-signer on the promissory note, who's here today, and Mr. Rose. Those were the only parties present. And my client simply had nothing to do with the collateral that was to be offered in regards to the so-called security for this promissory note.

Mr. Collins is one of our creditors in the bankruptcy. He's listed there for 150,000, although he's admitted -- and there's no disagreement that the amount he put up was 100,000 for a four-month turnaround where he was supposed to be paid 150,000. We're treating him in a plan. Plan is pending right now. We wanted to get through this. Other than that, I think the plan is confirmable. We've worked our agreements with all our creditors. We still have this non-dischargeable claim for -- basically for the 150. But only 100,000, in fact, was in fact remitted to Gibraltar.

We do have a stip- -- that's the end of my opening statement. The burden of proof is upon them on all the elements, as we know. We don't have to disprove anything. They have to meet all their burdens. But I did talk to the Collins before the hearing today. There are a stipulation we can reach regarding four exhibits.

THE COURT: Okay. Which is?

MR. NEWDELMAN: At least four exhibits were in my trial notebook as well as in their trial notebooks. And we'll use the hard book.

THE COURT: Okay.

MR. NEWDELMAN: It'll make it easier for the Court in the hard book.

THE COURT: All right. Which exhibits have you stipulated to?

MR. NEWDELMAN: By stipulation, the promissory note --

THE COURT: Let me just make sure. Mr. Collins, are you paying attention? Do you have the exhibit book in front of you?

MR. COLLINS: Yes, ma'am.

THE COURT: Okay. So the stipulation is for which exhibits, Mr. NewDelman?

MR. NEWDELMAN: Exhibit A in Debtor's notebook, which is the promissory note --

THE COURT: Okay.

MR. NEWDELMAN: -- dated December 14, 2006, in the sum of $150,000 executed by Emmanuel Illuminardi, who's here today, and Charlie Rose. That may be admitted into evidence.

THE COURT: Okay. Exhibit A is admitted by agreement.

(Exhibit A Received)

MR. NEWDELMAN: Exhibit C in the Debtor's notebook, which is a California Grant Deed. Not a recorded deed, but a California Grant Deed from Emmanuel Illuminardi to Derrick Collins. That's in my notebook. And so by stipulation that Exhibit C can be admitted into evidence.

THE COURT: Okay. Exhibit C is admitted by agreement.

(Exhibit C Received)

MR. NEWDELMAN: Debtor's notebook Exhibit Number F, which is the Washington Mutual Bank cashier's check for $100,000 payable, not to Mr. Rose but to Gibraltar Properties, is -- can be admitted by stipulation.

THE COURT: Okay Exhibit F is admitted by agreement.

(Exhibit F Received)

MR. NEWDELMAN: The next document which was common to both lists of exhibits is Debtor's Exhibit I.

THE COURT: Okay.

MR. NEWDELMAN: Exhibit I is a recorded instrument, a California Grant Deed from an entity known as New Hope Trust to Gibraltar Properties, LLC. And that can be admitted by stipulation.

THE COURT: All right. Good enough.

(Exhibit I Received)

THE COURT: I take it that's the only -- these are

the only documents we have stipulations on. Right?

MR. NEWDELMAN: That's correct.

THE COURT: Okay. All right.

MR. NEWDELMAN: Now --

THE COURT: Anything else, Mr. NewDelman, before we start the evidence?

MR. NEWDELMAN: Before we begin, in reviewing the documents which are not in evidence yet that had been presented to me by the Collins, I do want to point out to the Court and perhaps the Court can advise Derrick Collins accordingly, some of the documents that he plans to introduce has to do with matters that stem from the mediation and the result of the attempt to get this matter settled and some numbers that were bantered back and forth after the mediation to see if we could reach some accord and a resolution. Because I think you were well aware that we were getting close. And we went to see Gary Keltner on the mediation.

And I'm not sure if the Collins fully understand that any discussions that we ever had on this matter before, during or after the mediation has any relevancy here today nor should they be discussed as having any value to this litigation.

THE COURT: Okay.

MR. NEWDELMAN: I'm just afraid they'll try to get into some of that --

THE COURT: Well, we can deal with it as it comes it

up unless -- Mr. Collins and Mrs. Collins, just a general matter, when people are -- decide to go to mediation, and I strongly encouraged that in this case, those negotiations are not relevant to what I have to decide today.

MR. COLLINS: We're already aware of that, Your Honor. We're already aware of that.

THE COURT: So that's just not going to come in today.

MR. COLLINS: Already aware of that.

THE COURT: The issue today is whether at the time of the transaction --

MR. COLLINS: Yes, ma'am.

THE COURT: -- the Debtor, according to your complaint, I think your allegation is a 523(a)(2) fraud complaint. Right?

MR. COLLINS: Yes, ma'am.

THE COURT: You're seeking to avoid discharge. So everything is going to focus on what happened at the time that the transaction occurred. Okay?

MR. COLLINS: Yes, ma'am.

THE COURT: All right. So --

MR. NEWDELMAN: I have one other issue.

THE COURT: Mr. NewDelman?

MR. NEWDELMAN: I hope we can get done today. That's what -- we hope we can get done today. And I don't know what

time you're going to --

THE COURT: Well, we're going to go -- I plan on us getting done today. Let's see. If that doesn't happen, we'll deal with it.

MR. NEWDELMAN: And the only issue I'll raise, if we're getting close to the end of the day, I probably would like to carve out about no more than maybe 40 minutes at the end of the day before we finish. We brought a witness in from California. And as a courtesy --

THE COURT: No. I'll take your witness out of order.

MR. NEWDELMAN: -- we'd like to take the witness out of turn no matter where we're at. It's a bench trial.

THE COURT: Yeah. We'll take the witness out of turn.

MR. COLLINS: I'm from California too. So --

THE COURT: I know. But this a question --

MR. COLLINS: -- what's the deal?

THE COURT: This is a question of whether -- I'm going to control the proceedings. And I'm going to control the proceedings. There's only one witness other than the Debtor and you. So I'm going to control the proceeding. And I'll take the witness out of order. But it's way too soon to worry about that. It's only 2:00. We should be able to finish today. If we get to around 4:00 and we're not done, then I'll allow Mr. NewDelman to take his witness out of order.

All right, Mr. Collins, who do you want to call as your first witness?

MR. COLLINS: Charlie Rose.

THE COURT: Okay. Mr. Rose, please come forward and be sworn. And then you'll sit here for the examination. And I will allow Counsel to sit at counsel table and Mr. Collins to sit at counsel table for examination. Okay?

CHARLES ROSE, PLAINTIFF'S WITNESS, SWORN

MRS. COLLINS: Is it okay we sit here for the question --

THE COURT: I just said it will be fine.

MRS. COLLINS: Okay. Great. Thank you.

DIRECT EXAMINATION

BY MR. COLLINS:

Q Good afternoon, Mr. Rose.
A Hello.
Q Did you in fact sign the promissory note attached to the grant deed for collateral?
A I signed the promissory note, yes.

THE COURT: If there's an exhibit, Mr. Collins, that you -- when you talk about a grant deed, I don't believe -- I don't know what exhibit you're talking about. So it would be best if there's an exhibit --

MR. COLLINS: Promissory Note would be Exhibit --

THE COURT: A.

MR. COLLINS: Exhibit A.

THE COURT: Yeah. That's been stipulated into evidence. So -- okay. Was there something else you wanted to know? Was there --

THE WITNESS: Exhibit A appears to be a promissory note but nothing else.

BY MR. COLLINS:

Q On the promissory note, did you attach real property as collateral?

A I did not. No.

MR. COLLINS: Well, it says right here that he signed a promissory note of collateral, ma'am, with the real deed attached.

THE COURT: Mr. Collins, we don't make argument.

MR. COLLINS: Oh.

THE COURT: You're just getting evidence in the record. If you want to ask the witness questions about what the promissory note says about property --

BY MR. COLLINS:

Q Back in October of 2006, did you receive a cease and desist order from Randolph Rudd introduced into evidence, the document deed -- 40 and 41 -- which would be the 2007-012740.

MR. NEWDELMAN: Objection. Foundation.

THE COURT: Well --

//

BY MR. COLLINS:
Q And --
THE COURT: Wait a second, Mr. Collins. Hang on a second. Does the witness have a book of exhibits in front of him?
THE WITNESS: I have something here. I don't know if this is what it is that he's --
THE COURT: That's the Debtor's exhibits. Do --
THE CLERK: There's a notebook also.
THE COURT: There's -- okay.
THE WITNESS: There's another --
THE COURT: Mr. Collins, when you're referring to the cease and desist, did you --
MR. COLLINS: Yes, ma'am.
THE COURT: -- mark it as an exhibit?
MR. COLLINS: Yes, ma'am.
THE COURT: Okay. What exhibit number is it, sir?
MR. COLLINS: It's Exhibit 4, ma'am.
THE COURT: Exhibit 4. Okay. Mr. Rose, if you will go to the Plaintiff's exhibits and get Exhibit 4 in front of you.
THE WITNESS: Okay.
MR. NEWDELMAN: What was the old number on that? Because I don't have a new book. And my numbers are consecutive pages.

MRS. COLLINS: It would be 4. It would still be 4.

THE CLERK: It was Exhibits 4 through 14 is what they're on. The Court's exhibit number is 4.

THE COURT: Okay. So just so we're all clear, Mr. Collins, is this the exhibit you're talking about?

MR. NEWDELMAN: Okay.

THE COURT: Mr. Rose, do you have the exhibit in front of you?

THE WITNESS: I have something marked 4, but it has many pages to it that are --

THE COURT: Okay. All right.

THE WITNESS: -- different.

THE COURT: I just want to make sure everyone has the same exhibit. So Exhibit 4 is --

MR. COLLINS: Page 9, ma'am.

THE COURT: Excuse me?

MR. COLLINS: Page 9 from Exhibit 4.

THE COURT: Well, first, let's go back to -- are you asking -- what is your question to the witness about this exhibit?

BY MR. COLLINS:

Q Back in October of 2006, did you receive a cease and desist order from Randolph Rudd, introduced into evidence, the document deed, 40 and 41, Exhibit 4, Page 9.

MRS. COLLINS: He actually wants to do just 40, Page

9, right now.

THE WITNESS: No, I did not receive this any time in October of 2006 at all.

MR. COLLINS: Can I enter a document into evidence?

THE COURT: You have to ask me to enter this document into evidence. It has not --

MR. COLLINS: That's what I'm asking --

THE COURT: -- been --

MR. COLLINS: -- you. Can I enter --

THE COURT: You're asking me admit Exhibit 4 into evidence?

MR. COLLINS: Yes, ma'am.

THE COURT: Okay. And this is a certified copy of something called a California Grant Deed. Is that right?

MR. COLLINS: Yes, ma'am.

THE COURT: And, Mr. NewDelman, do you have an objection to this exhibit?

MR. NEWDELMAN: Well, I thought we were talking about the cease and desist --

THE COURT: It's stuck in --

MR. COLLINS: It's in there.

THE COURT: It's Page 8 of Exhibit 4.

MR. NEWDELMAN: Oh, at 9?

THE COURT: It's Page 9 of Exhibit 4.

MR. NEWDELMAN: Right. And all we're talking about is

the cease and desist letter. Right?

MRS. COLLINS: Right now. Yes.

THE COURT: Well, I'm can't -- I'm not going to do that. I'm not going to introduce one page from a marked exhibit.

MRS. COLLINS: Right. But --

THE WITNESS: If I may --

THE COURT: No, Mr. Rose. No.

MR. NEWDELMAN: My exhibit numbers don't match what they gave me a couple days ago to what we marked here today. So --

THE COURT: I understand that that's because she marked every single page as an exhibit.

MR. NEWDELMAN: I know.

THE COURT: And I can't -- we can't have that. All right. So here's the issue, Mr. Collins --

MR. COLLINS: I want to enter the whole exhibit.

THE COURT: -- what you are want into evidence is the cease and desist order?

MR. COLLINS: I want to enter the whole exhibit.

THE COURT: The whole exhibit.

MR. COLLINS: Yes, ma'am.

THE COURT: What is the whole exhibit?

MR. NEWDELMAN: Where does it start?

MRS. COLLINS: It starts on Number 4, Mr. NewDelman,

and ends on 14.

THE COURT: At the bottom, Mr. NewDelman, it says 1 of 11. It's an 11-page exhibit. It's been marked as Plaintiff's Exhibit 4.

MR. NEWDELMAN: Right. I got it. I got it.

THE COURT: All right? So Mr. Collins --

MR. NEWDELMAN: I object --

THE COURT: Well, wait. He has to tell me what the exhibit is. One thing at a time. What is this?

MR. COLLINS: This is the California Grant Deed from New Hope Trust to St. Catherine's Charitable Foundation Incorporated. In it, it shows all our sections -- it shows our section. The cease and desist order. And other signatures from Rudd showing that Gibraltar Properties had not title invested in this property.

THE COURT: Okay. That's a legal conclusion.

MR. COLLINS: Yes, ma'am.

THE COURT: So I don't want the legal conclusion.

MR. COLLINS: Oh.

THE COURT: The exhibit, itself, is a California Grant Deed. And this is a certified copy. Is that correct?

MR. COLLINS: Yes, ma'am.

THE COURT: Okay. Mr. NewDelman, your objection to the exhibit is what?

MR. NEWDELMAN: Yes, objection to Number 4. All I

have is a copy of a recorded document. That's all I have. I don't have anything that's a certified document. One, if we're using the whole document, part of this document is simply a classic hearsay of a statement signed by Mr. Rudd. That's part of this whole exhibit they want to introduce. So it's, one, relevancy in connection with what Mr. Rose knew at the time of December 14th, 2006, regarding some third party's ownership or lack of ownership of property. There's nothing to do with Mr. Rose on this California Grant Deed and the attachments attached to it is simply a hearsay statement.

Plus, if you look at Page --

THE COURT: Well, let's walk through this, Mr. NewDelman. This is a publicly recorded document. Now, I agree -- the fact of the matter is anyone can record anything publicly. That's doesn't make the document true. I can go down and record a grant deed to my dog at the county recorder's and they will record it. So I think as a public document, and I think you told me you got certified copies.

THE CLERK: The marked exhibits are the certified copies.

THE COURT: Okay. So there's a certified copy of a public document. It can come in as that. But it doesn't prove anything. It's just a certified copy of a public document. So I will admit it as a certified copy of a public document.

MR. COLLINS: Thank you.

THE COURT: But that does not mean -- let me be clear. That does not mean that I accept for purposes of this trial that every page in this document is true and the page you care about is Page 9 of 11.

MR. COLLINS: All the pages, ma'am.

THE COURT: All the pages you care about. But just because they've been admitted doesn't mean that I agree that they are true.

MR. COLLINS: Yes, ma'am.

THE COURT: Or that the document means anything other than the fact that it was recorded with the recorder in California.

MR. COLLINS: Yes.

THE COURT: All right? Now, the question you had for the witness, which I believe he answered, is had he ever seen Page 9 of 11. And, Mr. Rose, your answer is no?

THE WITNESS: My answer is absolutely I did not see this anytime in October of 2006.

THE COURT: All right. So next question. And Exhibit 4 is admitted.

(Exhibit 4 Received)

MR. NEWDELMAN: Your Honor, may I raise a question on Page 9 of 11 for you.

THE COURT: I've already admitted the document, but as I said, it doesn't mean that I agree that --

MR. NEWDELMAN: I know --
THE COURT: -- for its true or --
MR. NEWDELMAN: But Page 10 seems to be a document that's not even connected with 9. If you look at 10, it has letter F. And it looks like there might be an A, B, C, D, E, that -- it's a page that just was taken somewhere and put into the --
THE COURT: Well --
MR. NEWDELMAN: -- top of --
THE COURT: -- as I said before, Mr. NewDelman, how much weight I will give to this document --
MR. NEWDELMAN: It just doesn't flow.
THE COURT: -- is unclear. But, you know, it's a public document. I'll admit it into the record. The certified copy. Mr. Williams, next question. Collins. I'm sorry.
MR. COLLINS: Yes, ma'am.
THE COURT: My mistake. Mr. Collins.
MR. COLLINS: Also on that document, I would for you to know that on Page 1, that Mr. Rudd signed this document on May 1st of 2006. We went into an agreement with Mr. Rose in December of 2006, after this document was presented.
THE COURT: Okay.
MR. COLLINS: Was recorded.
THE COURT: Mr. Collins, there's a question here to the witness. How would this witness know when Mr. Rudd signed

Page 1? You need to ask him if he knows that. If he was there. If he has an idea who Mr. Rudd is. In other words, I need more foundation. You haven't established that Mr. Rose even knows who Mr. Rudd, much less that he understands -- that he agrees that Mr. Rudd signed this document.

BY MR. COLLINS:

Q Mr. Rose, do you know Mr. Rudd?

A I do know Mr. Rudd, when he was alive.

Q Were you there when he signed the document?

A No, I was not there nor was I was informed this document was ever signed.

THE COURT: Okay. This is what I'm going to do. I'm going to take about a 15-minute break so you can sit down, you and your husband can sit down and you can go through a series of questions you want to ask Mr. Rose.

MRS. COLLINS: Okay.

THE COURT: So -- because, you know, it's causing you a lot of stress to sit there and try and figure out. So we'll take a break until about 2:25. And try to get five or six questions that you want to ask -- maybe you have a lot more to ask Mr. Rose. But here's what I need. I need to know when you ask a question about a document, you give the witness the document. You ask the witness if he's ever seen the document. If he knows who the people are who signed the document. Those are the kinds of things that I need in order for the document

to have any meaning. Even though it's in evidence right now, it's just in evidence. It doesn't really mean anything because there's been no connection between the document and the Debtor. Okay? All right.

So I'll come back out about 2:25. There are rooms out -- if you want privacy, there are rooms -- attorney conference rooms where you can go or maybe Mr. NewDelman and his client and his witness can go outside to give you the privacy. Okay?

You can step down for now. I'll be back out at 2:25. Okay?

(Recess)

THE CLERK: All rise.

THE COURT: Have a seat. All right. Mr. Collins, are you ready to go?

MR. COLLINS: Yes, ma'am. I think I got it down now.

THE COURT: Okay. All right.

MR. COLLINS: Okay.

THE COURT: All right. Next question for the witness, please.

BY MR. COLLINS:

Q Mr. Rose, are you aware of the recorded document, Document Number --

MR. COLLINS: Exhibit 5, ma'am.

//

BY MR. COLLINS:
Q -- Document Number 2007-012741?
A Am I aware of it now as an exhibit? Or am I aware of it --
Q Are you aware of it now as a recorded document?
A I'm seeing it as an exhibit. I see that it was recorded -- looks like March 27th of 2007. I guess it's a certified copy, so --
Q Did you have any knowledge of this deed before?
A Before what?
Q Before it was recorded.
A No. Absolutely not.
MR. COLLINS: Your Honor, I would like to enter into evidence Exhibit 5 and note, Your Honor, on Page 1, Section 11. These sections match my deed, my collateral deed.
THE COURT: Well, the document is what it is. It's a certified public document. I'll admit it.
(Exhibit 5 Received)
MR. COLLINS: Yes, ma'am.
THE COURT: I overruled Mr. NewDelman's objection.
MR. NEWDELMAN: I'm confused. What exhibit is it? Is it the same one we just had --
THE COURT: Exhibit 5.
MR. NEWDELMAN: -- to St. Catherine or --
MRS. COLLINS: It's St. Catherine's to Anagenesis.

Okay. Should be the next document.

MR. NEWDELMAN: As a matter of public record, it can be admitted for what it's worth.

THE COURT: Okay. And this is a grant deed from St. Catherine's charitable foundation or to St. Catherine's? So St. Catherine's Foundation grants to --

MRS. COLLINS: Anagenesis.

THE COURT: -- Anagenesis, the legally described documents. Okay. Exhibit 5 is admitted for whatever might make of (sic).

BY MR. COLLINS:

Q Mr. Rose, I'm going to refer to back Exhibit 4, Page 3.

A Okay.

Q Are you aware of this recording?

A Yes. I know about this particular recording.

MR. COLLINS: Your Honor, I would like to enter into evidence Exhibit 16, Doc. 2007-001995.

THE COURT: Let me get through -- Exhibit 16?

MRS. COLLINS: It has the --

MR. COLLINS: These are recorded sections of my deed --

THE COURT: Hang on a second. No.

MR. COLLINS: Oh.

THE COURT: You can't tell me what's in the exhibits. Okay?

MR. COLLINS: Oh. Oh. Oh. I'm sorry.

THE COURT: So just hang on.

MR. COLLINS: Sorry. I'm fired up here.

THE COURT: Yeah. Let's just take it one step at a time. Here's Exhibit 16. It starts with a fax cover sheet?

MRS. COLLINS: Yes.

THE COURT: Okay. Does -- we have a witness on the stand. Is this a document that you want to ask the witness about?

MRS. COLLINS: He just asked him is he aware of this --

THE COURT: I thought you were asking him about part of Exhibit 4.

MRS. COLLINS: Oh, yeah, we do want --

MR. COLLINS: Page 3.

THE COURT: Page 3 of Exhibit 4, which I have no idea what that is. The question was -- was it about Page 3 of Exhibit 4? Which is in evidence. But you haven't asked him anything about Exhibit 16.

MR. COLLINS: Exhibit 16 was obtained from Dolores Provencio on May 21st, 2010 --

THE COURT: It's a certified document. I'm going to let all your certified documents in. So I'll admit Exhibit 16 because it's a certified copy.

(Exhibit 16 Received)

THE COURT: But do you have a question for the witness about this exhibit?

BY MR. COLLINS:

Q Mr. Rose, were you aware that this deed could not be recorded?

A I was not aware of that, no.

MR. COLLINS: Your Honor, I would also like to enter into evidence Exhibit 18 showing Exhibit 16 cannot be recorded.

MR. NEWDELMAN: That's argumentative.

THE COURT: That's a legal conclusion. I mean, if you want to exhibit -- as I said, I will admit all of your certified public document. If this is a certified public document, it will come in.

MR. COLLINS: Yes.

THE COURT: But as to the rest of what it shows -- do you have a question for the witness about Exhibit 18? That's a legal conclusion.

MRS. COLLINS: But it's a conclusion from the County Assessor's office.

THE COURT: The County Assessor is not a court. And the County Assessor does not decide whether a document is valid or not. It just -- you know, I don't --

MR. COLLINS: Right. We understand.

THE COURT: I mean, in any event, what do you want to do with Exhibit 18? Does this witness -- is there a question

for this witness about Exhibit 18?

MR. COLLINS: No.

THE COURT: All right. So you just independently ask for the admission of Exhibits 16 and 18, but you don't have questions for the witness about these exhibits?

MRS. COLLINS: He said he was aware of the deed -- he was aware of the recording of --

THE COURT: I'm sorry, Ms. Collins.

MR. COLLINS: He said he was aware of the recording, ma'am.

THE COURT: Of which recording? He testified he aware of Page 3 of Exhibit 4.

MR. COLLINS: Okay.

THE COURT: Is there something else he's testified to that I missed? Did he testify that he was aware of Exhibit 16?

MR. COLLINS: Yes, ma'am.

THE COURT: Mr. Rose, did you testify that you were aware that Exhibit 16 had been recorded?

THE WITNESS: Let me take a look at 16. Bear with me. I am aware that this deed has been recorded.

THE COURT: Okay. So you've testified that you're aware that Exhibit 16 has been recorded. Okay. All right.

So, Mr. Collins, do you have any other questions for the witness about Exhibit 16 or Exhibit 18?

//

BY MR. COLLINS:

Q Mr. Rose, were you aware that it could have not have been processed?

A No. I was not aware of that.

MR. COLLINS: Can I enter in an exhibit, ma'am, that a letter stipulating that it could not have been processed.

THE COURT: I don't know what exhibit --

MR. COLLINS: 18.

THE COURT: Exhibit 18?

MR. COLLINS: Yes, ma'am.

THE COURT: What is Exhibit 18?

MR. COLLINS: It's the follow up letter from the Imperial Assessor's county for the recorded deed of Exhibit 16.

THE COURT: Well, it's a public record. I guess the question is -- I'll admit it as a public record. Do you have a question for the witness about Exhibit 18?

MR. NEWDELMAN: Your Honor, I don't see that that one's a public record. I'm not even sure if it relates to the other documents.

THE COURT: Well, it's incomplete. It says Assessor's Parcel Number 2007-0071995, description, see deed. The deed is not attached. It does represent -- it says, "The document recorded 011807 and the document number is 001995," which appears to be the same as Exhibit 16. Right, Mr. NewDelman?

MR. COLLINS: Yes, ma'am.

MR. NEWDELMAN: Yes.

THE COURT: And then it's a certified copy of a letter from the Assessor's office. It says -- it can come in because it's a certified copy. And the document says, "Property in another name or names or record -- all properties described are not in the name of Inter Trade and Commerce."

MR. NEWDELMAN: I want to state an objection on just relevancy because the time of the transaction is December 14th of 2006. Could be transferred numerous times before or after that period of time. But the issue here for fraud is what was the intent on the time the money transferred December 14th of 2006, not --

THE COURT: So your objection is relevance --

MR. NEWDELMAN: Relevancy.

THE COURT: -- based on the fact that this Exhibit 16 and 18 occur two years after the note is signed. Okay. The relevance objection is noted in this exhibits. The relevance will go to the weight. So the exhibits are admitted.

Okay. Mr. Collins, you understand --

(Exhibit 18 Received)

MR. COLLINS: Yes, ma'am.

THE COURT: -- what's happened here is I've admitted them. But I don't know how much weight I'm going to give them because both documents refer to a time period years after your

note.

MR. COLLINS: Yes. And also I would like to enter the note of the signature, ma'am. Document 2007-001995.

THE COURT: Which exhibit number, Mr. Collins?

MR. COLLINS: Exhibit Number 16, ma'am.

THE COURT: Exhibit 16 has already been admitted.

MR. COLLINS: The signature from Dr. Rudd is not the same.

THE COURT: That's argument again, Mr. Collins. Do you have a question for this witness.

MR. COLLINS: Arguing with you (sic) --

THE COURT: It is, sir. It's argument.

MRS. COLLINS: Okay.

THE COURT: This witness is -- you can ask him whether or not he was present when Exhibit 16 was signed and recognizes the signature.

BY MR. COLLINS:

Q Mr. Rose, were you present when this signature was signed by Mr. Rudd?

A Which exhibit?

THE COURT: 16.

BY MRS. COLLINS:

Q Exhibit 16.

A Take a look. I did witness him signing this document.

MRS. COLLINS: I'm sorry. We didn't hear you.

THE WITNESS: I did witness him signing this document.

BY MR. COLLINS:

Q Mr. Rose, do you know Antonious, the current owner --

MR. NEWDELMAN: Objection.

BY MRS. COLLINS:

Q -- of the land?

MR. NEWDELMAN: Objection. Calls for a legal conclusion, who's the current owner of the land.

THE COURT: Well, it just lacks foundation. I don't know who -- there's no evidence about who the current owner of the land is.

MR. COLLINS: I have record of who owns the land, ma'am.

THE COURT: Well, you haven't given it -- you haven't established on the record. So you can't ask the question --

MR. COLLINS: Yes, ma'am.

THE COURT: -- until you establish that. So the objection is sustained.

BY MR. COLLINS:

Q Do you know Antonious, Mr. Rose? Antoniades?

A I don't know him personally. I have met him.

MR. COLLINS: I would like to enter into evidence Exhibit 19, an email from Antonious, the legal recorded owner.

THE COURT: Again, that's a legal conclusion,

Mr. Collins. You haven't put anything into evidence to demonstrate that Antonious is the owner of the property.

MR. COLLINS: I just said I would like to enter into evidence Exhibit 19 regarding the property from Antonious, the legal owner --

MRS. COLLINS: Who is Anagenesis Development Corporation?

BY MR. COLLINS:

Q Right. And who is Anagenesis Development Corporation on the current deed.

THE COURT: Mr. NewDelman?

MR. NEWDELMAN: Your Honor, objection. First, the document is hearsay. Second, the document was not produced to me. It's dated May 26th, which was yesterday, so obviously it was handed to me this morning. It's not part of the document exchange.

THE COURT: Well, it's clearly hearsay.

MR. NEWDELMAN: Clearly.

THE COURT: It's, you know, you're introducing the document for the truth of what the document says, and Mr. Antoniades --

MR. COLLINS: Antoniades.

THE COURT: -- is not here to testify. I will not admit Exhibit 19 over the objection.

MRS. COLLINS: But I had --

THE COURT: Ms. Collins.

MRS. COLLINS: Tell her that you had admitted the witness statement in your past exhibits to Mr. NewDelman.

THE COURT: It doesn't matter. He's not here to testify. Whether or not you disclosed him as a witness or not, he's not here. And this is an email. You want me to accept the truth of the email. That makes it hearsay.

MR. COLLINS: Yes, ma'am.

MRS. COLLINS: Tell her you would like to enter one more thing into evidence -- that we're done with Rose and you would like to enter one more thing into evidence.

MR. COLLINS: I would like enter one more thing in evidence, ma'am.

THE COURT: Sure. Mr. Collins, you can try to admit all your exhibits.

MR. COLLINS: Yes, ma'am.

THE COURT: I mean, it doesn't mean I will. But you can certainly ask.

MR. COLLINS: Yes, ma'am. Exhibit Number 17. It is a current Chicago Title inquiry describing our deed and who the current documented owners are of the grant deed.

THE COURT: Mr. NewDelman, do you have Exhibit 17 in front of you?

MR. NEWDELMAN: I do. First page -- I think the second page there, the California Grant Deed, is already in.

MRS. COLLINS: Correct. It is.

MR. NEWDELMAN: And I don't know what the first page adds to it.

MR. COLLINS: I just read (sic) current resource of my information, ma'am.

THE COURT: I understand that. But what are Pages 3 and -- what are the last three pages of -- or the last two pages of this exhibit?

MR. COLLINS: Those are the pages that she attached with the title.

THE COURT: There's no document of title here.

MR. COLLINS: The USA (sic) describes the owner. The parcel number and some of the APNs.

MR. NEWDELMAN: Your Honor, the problem I have with that particular attachment, if you look at the parcel number, it's 028. Now, we're getting information that the property is so-called owned at some point in time by the government, USA. Before, it says it's owned by St. Catherine.

THE COURT: Well, my problem with the document is, this is not a certified public document. This is a document from a title company. They're not here to testify. I don't -- so it's hearsay. I mean, this is based on the title company's research, but the title company is not here to tell me where they got this information. So I don't know what to do with it. It shows the owner is the US Gunnery Range. But I don't know

what that's based on or where they got their information. I don't know -- so I -- what I'm trying to explain to the Collins is, when it's -- this is not a document that appears in the public record. This is based on what the title company told you they did when they researched title of this particular parcel number. Correct?

MR. COLLINS: Yes, ma'am.

THE COURT: But you didn't bring anyone from the title company here to testify about this.

MRS. COLLINS: No, they wouldn't come.

THE COURT: Well, I'm sorry to hear that. But I cannot admit this exhibit. The deed, itself, is already in evidence. But the attachments and -- because you're asking me, again, to accept the truth that this particular parcel number is owned by the US government, which is -- I -- which right now is hearsay because we don't have the witness from the title company to testify about what they did to conduct this research. So Exhibit 17 is not admitted. Okay.

Any other exhibits out of your package, Mr. Collins? Mr. Collins.

MR. COLLINS: I guess that's it, ma'am.

THE COURT: Do you have any other certified public documents you want me to admit? We've admitted the promissory note. What about Exhibit 2?

MR. COLLINS: Exhibit 7, I would like to enter,

ma'am.

THE COURT: All right. Let me get there. Exhibit 7.

MR. NEWDELMAN: And, Your Honor, could you describe that? Because I don't have a notebook that follows your same numbers.

THE COURT: Okay. It's a October 10th, 2009, letter, it looks like, from the county recorder --

MR. COLLINS: Yes. ma'am.

THE COURT: -- or a transmittal from the County Recorder of Imperial County to Mr. Collins. I don't know what it stands for.

MR. NEWDELMAN: It would be hearsay, Your Honor.

THE COURT: Well, yeah, this isn't a publicly-recorded document.

MR. NEWDELMAN: Right.

THE COURT: This is just a letter you received --

MR. COLLINS: This is --

THE COURT: This is a transmission you got from the County Recorder's office. Correct?

MR. COLLINS: In regards to my deed when I tried to record it for trial, ma'am, this is the response that I got. This letter.

THE COURT: Well, it references the check. But it doesn't tell me what you were trying to record. It doesn't describe a legal description or a parcel number. I don't know

what piece of property it goes to. You know, Mr. Collins, when you take the stand, you can testify about this document and why it is you got it. But I'm not going to admit it right now because I don't have enough foundation to understand what it is. Okay?

Any other publicly recorded documents that we might be able to admit?

MR. COLLINS: I got Exhibit 14, ma'am.

THE COURT: Okay. Let's explain to Mr. NewDelman what that is. Exhibit 14 is, again, not a publicly-recorded document.

MR. NEWDELMAN: Can you just tell me what it is?

THE COURT: It's a press release.

MR. NEWDELMAN: Objection on relevancy.

THE COURT: Well, I'm not going to admit it right now. Maybe when Mr. Collins testifies, he can explain to me what that means. But right now, it's not coming in. And it involves South Lake Tahoe. I don't think it has anything to do with this case.

What about Exhibit 13, Mr. Collins, something from the Department of Insurance? It looks like an official document.

MR. COLLINS: Yes, this is a cease and desist order against Charlie Rose and others.

MR. NEWDELMAN: 13?

MR. COLLINS: Exhibit 15. Looks like 15.

THE COURT: Maybe it's 15. It is 15. My mistake. So do you have this?

MR. NEWDELMAN: Same objection, relevancy. It has nothing to do with this transaction.

THE COURT: Does this have anything to do with your property?

MR. COLLINS: It shows --

THE COURT: Does it have anything to do with your property, sir?

MR. COLLINS: -- character, ma'am. No, it doesn't.

THE COURT: Okay. I'm not admitting Exhibit 15. All right. Mr. Collins, do you have any more -- if we're done with your documents for now, it doesn't mean you can't ask -- you might be able to ask me again about some of these documents. But for right now --

MR. COLLINS: Yes, ma'am.

THE COURT: -- we've admitted what we've admitted. Do you have any more questions for Mr. Rose?

MR. COLLINS: No, ma'am.

MR. NEWDELMAN: Would you like for me to do my direct examination now?

THE COURT: Hang on a second. I want to make sure Mr. Collins is understanding. So -- I don't think so. I think what we ought to do is take your out-of-state witness and get

that done.

MR. NEWDELMAN: Okay.

THE COURT: And then we'll let Mr. Collins testify. All right. So you may step down, Mr. Rose. But you can be recalled by your own lawyer. I understand that you guys had to come from California. But nevertheless, I'm in charge of the trial and the sequence of the witnesses. So I'm going to let Mr. NewDelman call his witness from California now. And then Mr. Collins will have a right to cross-examine. And then Mr. Collins, I assume you'll be the next witness. Correct?

MR. COLLINS: Yes, ma'am.

THE COURT: All right. Good enough.

EMMANUEL ILLUMINARDI, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. NEWDELMAN:

Q Good afternoon.

A Hello.

Q My name is Alan NewDelman. I represent Mr. Rose. State your full name, please.

A Emmanuel Illuminardi.

Q Mr. Illuminardi, you live in the state of California?

A I do.

Q And you are here as a witness requested by Mr. Rose?

A I am.

Q Okay. And is it okay if I go by Manny?

A It is.
Q Okay. Otherwise I may mispronounce your name a few times. But Manny I can handle.
A Most people who know me do.
Q Okay. Thank you. Why don't you just give the Court just a very short synopsis of -- what is your educational background? Real short.
A I am actually an alumni at ASU. I have been self-employed my entire life in construction as well as some manufacturing. And for the past several years, I have been recovering from a loss in the construction development field.
Q Now, let me tie in how you are related to the various parties that are involved in here. And let's start with my client, Mr. Rose. What is the relationship with him? How long have you known him and in what capacity?
A As a friend. And I've known him a little over four years.
Q Okay. Any social or business?
A Both.
Q Both. Okay. And do you know Mr. and Mrs. Collins?
A I have met them on occasion. I do not personally know them.
Q When was the first time did ever meet Mr. or Mrs. Collins?
A A few months after the default of the loan, I met them at their home.
Q So that would be approximately sometime in the spring of

2007.
A Correct. With Mr. McDaniels.
Q One of the other --
MR. COLLINS: I couldn't hear that last statement. Who? I couldn't hear that one.
THE WITNESS: I met you at your home with Mr. McDaniel.
MR. NEWDELMAN: There are headphones up there. And sometimes I have to use them too.
THE COURT: If you need the headphones, you can come get a pair.
MR. COLLINS: I'll just -- there was just a channel between --
THE COURT: Yeah.
MR. COLLINS: -- I'll stand up a little bit if I can hear. Go ahead.
THE COURT: Well, you can also have the headphones.
BY MR. NEWDELMAN:
Q One of the other characters in this situation is a gentleman named -- I think he goes by Mac McDaniels.
A That is correct.
Q And who is -- what do you know about Mac McDaniels?
A We have been friends for over 25 years. At the time I met him, he was a banker. And since, he has been a tax preparer, which we have done numerous real estate ventures with, funding,

as well as personal.
Q Now, you heard the part of the opening statement that Mrs. Collins made. Is that correct?
A That is correct.
Q And you heard her indicate that Mr. McDaniel was -- handles their tax returns and accountant.
A That is correct.
Q Okay.
A I was aware of that.
Q Did you know him in that capacity too? Did you ever use him for yourself as an accountant?
A I have never used him in that capacity.
Q Okay. Have you had any business dealings with Mr. McDaniel over the years?
A Many business dealings.
Q In what nature? What type of business?
A Real estate predominantly. Short term loans. Hard money loans. Funding homes. Funding developments. And most of our business dealings have been handshake deals, actually. And he has always been honest and forthright and I've always managed to pay my obligations with him. Sometimes late, but I always pay.
Q The other character in today's case is Gibraltar Properties. Do you know of that entity?
A I do know of the entity.

Q Do you know who the principals are of that entity?
A I know -- I have met Tony Thompson. I have been on the phone while (sic) some of the other principals, but I've never met them.
Q Do you have any knowledge or information whether Mr. Rose has any ownership interest in Gibraltar Properties?
A None to my knowledge.
Q Do you have any ownership interest in Gibraltar Properties?
A No, sir, I do not.
Q Have done business with Gibraltar Properties?
A Just this one transaction.
Q Okay. And describe the transaction. What was to happen?
A My understanding and from documents that I had seen at the time is they had deeds to this particular property.
Q They being whom?
A Gibraltar property. And they were in the process of clearing title. And they needed a loan to fund the last part of clearing title so that they could get title insurance.
Q Okay.
A So as a result, I went to my friend, Mr. McDaniels, who has in the past gotten short term money for me, very quickly, and represented that a company that Charlie was working for, Gibraltar Properties, need money to get title sealed because they had a larger venture that was relying on that title

insurance.
Q You're -- you took an assignment from Gibraltar to find them some final capital that they needed to raise. Is that --
A That is correct.
Q Okay. And is this something you had experience doing, to try to go out and raise some venture capital?
A Off and on throughout my life, yes.
Q Okay. And one of the -- did you contact someone other than McDaniel? Or that was just McDaniel?
A I contacted a few people. But McDaniels and I have done business many times over the years and he knows my character and --
Q Okay. So when --
A -- that's where --
Q -- got the assignment from Gibraltar, is that just written or handshake or just you were going out looking for some venture capital for Gibraltar Properties?
A It was a request. I was signed -- I did not have a signed agreement.
Q About how much money did Gibraltar need?
A They needed $100,000.
Q And you -- did you convey that to Mac McDonald (sic)?
A Yes, sir, I did.
Q And Mr. McDonald, did he -- well, I don't want to get to hearsay. Did he indicate to you that he thought maybe he knew

somebody that would be interested?
A He did.
Q Okay. Did he indicate who that was?
A At the time he stated he had a client who had recently come into an inheritance who may, for the interest rate that was being offered, provide the funds for the loan.
Q Did you later learn that that was Mr. Collins?
A I did.
Q Okay. About what time frame are you talking about now where you had the discussion with Mr. McDonald about -- McDaniels about putting some venture capital in? We know the Note, which is in evidence, is dated December 14th. So back me up a little bit. When were you in these discussions with McDaniels?
A Well, this is easy because it was right after my wife's birthday, which was December 7th --
Q Good.
A -- that --
Q Real short period of time?
A Yes.
Q Okay. Was there a meeting held between some of the parties involved in this transaction?
A Basically Mr. McDaniels was relying on me for this.
Q What was he relying you for?
A Because he didn't know the other parties and I had known

Charlie and had seen all of the documents. He asked that I be a part of the deal because he knew me and he knew that if something didn't go right, I would keep my word.
Q That would be Mac McDaniels wanted you to be part of the transaction?
A That is correct.
Q Because he knew you and didn't know Charlie or Gibraltar?
A Gibraltar. Correct.
Q All right. Was a meeting arranged?
A Yes, we did meet to discuss that.
Q Do you know when that took place?
A I know that we discussed the terms of the deal and that it was discussed that I be on the actual loan documents because I was his friend and he relied on my ability to make sure that it got paid no matter what happened because this was his client. And --
Q Was there a meeting that took place on December 14th, 2006?
A That was when we signed the documents.
Q Why don't you look at Exhibit A, which is in evidence, in the hard book.
A Then would that be Number 1?
Q The black one.
A Okay.
Q Okay. Now, the Note is December 14th, 2006. Is your

testimony here today that there was actually a meeting that day?
A That was when we all met with documents, yes.
Q And at whose office?
A Mr. McDaniels'.
Q And who was in attendance at that meeting?
A Myself, Charlie Rose, Mr. McDaniels, and Tony Thompson, who was the representative for Gibraltar Properties.
Q Okay. Mr. Collins was not there. Correct?
A No, sir, he was not.
Q Mrs. Collins was not there.
A No, sir.
Q You said Mr. Thompson was there. Right?
A Yes, sir.
Q Was he there in his own capacity or in the capacity of representing Gibraltar Properties?
A He was there as a representative of Gibraltar Properties.
Q Okay. Do you know if that was the first time that Mr. Thompson then met Mr. McDaniel who was acting as the agent for Mr. Collins?
A I believe that was the first time he physically met him, yes.
Q Okay. Do you know, if you know, who prepared the Note?
A Mr. Thompson.
Q So Gibraltar -- you mean, on behalf of --

A Gibraltar Properties.
Q Okay. Now, this obligation refers to $150,000 obligation. That's not the amount that Mr. Collins made a loan. Right?
A No, sir.
Q How much was it?
A It was $100,000.
Q And it was to be paid, as stated in this Note, a couple months later, April 14th of 2007?
A Yes, sir.
Q No interest? It was kind of all built in? Hundred in, 150 back out. Right?
A That's correct.
Q Okay. For a very short term?
A Yes, sir.
Q All right. Now, Mr. Collins was trying to make a point this morning regarding this Note is secured by real estate. And we're talking about a certain township of almost 23,000 acres of land in Imperial County, California. You see that provision on the Note? Second paragraph.
A Yes.
Q See that?
A Yes.
Q Now, whose property was going to be utilized as security?
A Gibraltar's.
Q Was it ever your property to be used as security?

A Absolutely not.
Q Was it ever Mr. Rose's property to be used --
A Not to my knowledge.
Q Did you ever represent at all to Mac McDaniels --
A Never.
Q -- that you were pledging any of your property?
A Never.
Q Did you ever indicate to Mr. McDaniel that Mr. Rose's property was being pledged for this loan?
A Never.
Q All right. Who was responsible for preparing any forms of deeds or mortgages against the property to secure this loan?
A Gibraltar property prepared all the documents.
Q At that meeting you attended, was there any other documentation presented other than the Note by Mr. Thompson?
A He presented me with a grant deed giving me title to the property --
Q Okay.
A -- which I, in turn, used to secure with the promissory note.
Q Now, let me ask you a question. And -- we did talk yesterday, did we not?
A Yes, sir.
Q Okay. And let's look at Exhibit B, not yet in evidence. In Exhibit B I have a document that says Gibraltar Properties

to Emmanuel Illuminardi. Is that correct?
A That is correct.
Q Okay. And it does refer to the same parcel that is described on Exhibit A, the Note?
A That is correct.
Q Before I go on to another question, I just have to ask you a question. Why did you sign the Note?
A I believe that Gibraltar property truly owned the property. I was aware of the effort to gain title insurance. I had spoken to the gentleman who was doing the research and was assured that title insurance would be granted. And I was also aware of a pending deal that Gibraltar property had acquired once title insurance was gained to pay back the loan.
Q Is this from your own due diligence on the fact that there was going to be this parcel that would serve as security for the loan?
A Yes, sir. I was giving my word to my friend of 25 years that it was okay.
Q That friend being Mac McDonald?
A Yes, sir.
Q All right. You take any position here today that you're not responsible --
A Absolutely not.
Q -- under that promissory note?
A I have never claimed that I do not owe the money. I just

haven't been in a position for the last few years to pay it.

Q Okay. So you do admit here in court that you are the signatory on that Note and that is your obligation. Correct?

A I am. And eventually it will get paid.

Q Okay. And Mr. Rose also signed that Note. Correct?

A Yes, sir.

Q Okay. Now, let's look at B. I'm curious, and maybe you can explain this to me. Is -- Mr. Thompson was there from Gibraltar. Correct?

A Yes.

Q But Gibraltar did not issue this deed from Gibraltar to Collins. Is that correct?

A That is correct.

Q Do you know the reason for that?

A I gave my word to Mr. McDaniels and Mr. McDaniels asked me to be responsible.

MRS. COLLINS: Mr. McDaniels --

THE COURT: Ms. Collins, you may not speak at all. Ms. McDaniels (sic) --

MR. COLLINS: I would like to object, Your Honor, because Mr. McDaniels is not here to testify on anything that was said. That's hearsay.

THE COURT: What he said is, gave Mr. McDaniels his word. That isn't hearsay. What part of what he just said was hearsay? There has been hearsay, but you didn't object, so I

let it go. But this particular statement wasn't hearsay, so the objection's overruled.

BY MR. NEWDELMAN:

Q Is it your statement here, Manny, that the reason the deed came in and the deed went it out was at the request of Mr. McDaniels?

A Yes, sir.

MR. COLLINS: Objection.

THE COURT: That is hearsay and the objection is sustained.

BY MR. NEWDELMAN:

Q Okay. The signature that's on that document, Exhibit B, do you know whose signature that is?

A I believe that is Mr. Thompson's signature.

Q Did you witness that signature?

A Yes, sir, I did.

Q Okay. If you'll go over to Exhibit F --

MR. COLLINS: Excuse me, Your Honor, on that last question, could that be argumentative? Because how do I know that he was there to sign that? What other witnesses stipulated that Anthony Thompson and Emmanuel Illuminardi was in the room when they signed that paperwork? Who else was in there? I mean --

THE COURT: You'll get a chance, Mr. Collins, to cross-examine the witness.

MR. COLLINS: Yes, ma'am.

BY MR. NEWDELMAN:

Q Manny, take a look at Exhibit F --

THE COURT: So the objection is overruled.

BY MR. NEWDELMAN:

Q -- which is in evidence.

THE COURT: What exhibit are we on, Mr. NewDelman?

MR. NEWDELMAN: Huh?

THE COURT: What exhibit? I'm sorry.

MR. NEWDELMAN: F. F.

THE COURT: Thank you.

MR. NEWDELMAN: Thank you.

BY MR. NEWDELMAN:

Q Just look at, Manny, Exhibit F, which is the cashier's check, payable to Gibraltar Properties. You see the back side of the check on F, which is in evidence?

A Yes, sir.

Q And I'm not asking you to be an expert in any way, but if you compare that signature on F to the signature that's on the grant deed from the California Grant Deed, does it appear to you to be the same signature?

A It does.

Q Okay. Any question in your mind that the deed that went from Gibraltar to you for the transfer, the same tract, the subject matter here, was executed by Mr. Thompson?

A Yes, sir.
Q Okay. And that deed from Gibraltar did in fact was a deed from Gibraltar to you. Correct?
A Correct.

MR. NEWDELMAN: Okay. I move to admit Exhibit B.

THE COURT: Any objection to the admission of Exhibit B?

MRS. COLLINS: I'm sorry. Repeat.

THE COURT: Do you have an objection to the admission of Exhibit B, which is a deed from Gibraltar to the witness.

MR. COLLINS: Yes, we got an objection, ma'am.

THE COURT: What is it, Mr. Collins?

MR. COLLINS: The objection --

MRS. COLLINS: The objection from the deed --

MR. COLLINS: It's not valid, ma'am. It's not recorded -- public. It's not -- where's this --

THE COURT: It's not an authenticated public document.

MR. COLLINS: Yes.

THE COURT: But that doesn't mean it can't be admitted. It simply means that it's not a self-authenticating document. The witness has testified that the conveyance was to him. And that it was signed in his presence. So is there some other objection?

MR. COLLINS: No.

THE COURT: Okay.

BY MR. NEWDELMAN:

Q Manny, the signature --

THE COURT: Exhibit B is admitted.

(Exhibit B Received)

MR. NEWDELMAN: Thank you.

BY MR. NEWDELMAN:

Q The signature that appears to be Mr. Thompson, that's dated December 14th. Correct?

A Correct.

Q And that is the same date as the promissory note that you signed. Correct?

A That is correct.

Q And there is a notary there. Do you happen to know who that notary is?

A Josephine. She has worked in Mr. McDaniels for quite a few years.

Q Do you know that as a fact?

A Yes, sir.

Q Okay. Thank you. Okay. Now, if you got to Exhibit C, next document, which is in evidence already, you also see a date of December 14th, '06 on that instrument as well. Is that correct?

A That is correct.

Q Okay. Was this document -- do you know who prepared the

document?
A Mr. Thompson.
Q Okay. And does that bear your signature?
A Yes, sir, it does.
Q Okay. And that was the second of the two deeds, Gibraltar to you and then you to Collins. Is that correct?
A That is correct.
Q Okay. Now, again, this appears -- and without a legal conclusion -- this appears to be a grant deed. Do you know what that is? Not asking you as a lawyer in any way.
A Yes, sir, I'm aware of what it is.
Q Okay. Was there supposed to be a deed to a piece of property conveyed with this transaction?
A I had no decision in making what documents were utilized. I was only asked to sign them and use them for the deal.
Q Uh-huh. Do you know the difference between a deed and a mortgage or a deed of trust?
A Yes, sir, I do. But that wasn't what was presented to me.
Q Okay.
A And it was made as a secured loan, not as a mortgage.
Q Did you understand that this was going to be a sale transaction of 23,000 acres or just a security for a loan?
A Just a security for a loan.
Q Okay. Do you know whether these documents were to be recorded or held, pocketed or something?

A To my knowledge, they were to be held and never to be recorded because the intent was to pay the loan back.
Q Were they permitted to be recorded after perhaps a certain time if there was a default?
A The document -- the original grant deeds were asked to be held in case of default to be surrendered.
MR. COLLINS: Can I object to that, ma'am? That's hearsay. Is that hearsay?
THE COURT: Well, there's certainly not enough foundation. I mean, I don't understand who was supposed to --
MR. COLLINS: Thank you.
THE COURT: Mr. Collins, let me finish. You know, I need more foundation, Mr. -- I need more foundation.
MR. NEWDELMAN: Very good.
BY MR. NEWDELMAN:
Q Well, let's go back to the transaction here. Mr. Collins was using $100,000 in order to have received back 150 four months later. Correct?
A Correct.
Q And there was going to be some form of security. As the Note says, there's was going to be security for his $100,000. Is that correct?
A Correct.
Q The Note never says that this was some form of a real estate transaction by which property was going to be conveyed

absolutely.

A No, it does not.

Q Okay. And that was your understanding?

A Correct.

Q Okay. Now, when you said the deed was to be held back, what do you mean that, held back?

A Charlie Rose was to hold those deeds in case of default, to which if there was a default, a written request was supposed to be made for those deeds in order to be surrendered and to my knowledge, that never took place.

Q Uh-huh. Okay. Do you have any information today actually what the current status of that property is? If you know.

A To my knowledge, Gibraltar Properties still owns it.

Q Okay. Do you know if any lawsuit has been -- well, let me ask you this. Has the Collins ever filed a lawsuit against you?

A No, sir.

Q Have they made demands against you?

A On several occasions.

Q In writing?

A Never in writing.

Q Verbally?

A Yes, sir.

Q Have they ever threatened you?

A They have made commented that can be taken that way, yes.

Q Did they threaten you with physical harm?
A They have implied that, yes.
Q But you admit your obligation to them today. Right?
A Have never denied it.
Q Okay. Have you paid them back anything?
A I have given some money to Mr. McDaniels. And my understanding is that Mr. McDaniels has given them --
MR. COLLINS: Objection. Hearsay.
THE COURT: Sustained.
BY MR. NEWDELMAN:
Q That's okay. Have you paid any money -- you heard the opening statement by Mrs. Collins where they have not received any money on this obligation which you are a signatory to. Correct?
A Correct.
Q Have you paid any money for the benefit of the Collins under that promissory note?
A I have.
Q How much have you paid?
A Around $2500.
Q And who did you pay that to?
A Mr. McDaniels.
MR. COLLINS: Objection.
THE COURT: No, Mr. Collins, that's not hearsay.
//

BY MR. NEWDELMAN:
Q Who did you pay --
THE COURT: And you can't just say objection.
MR. COLLINS: Of proof.
THE COURT: No, that's not a valid objection, sir. He can testify who he's paid -- what his understanding is.
MR. COLLINS: Yes, ma'am.
THE COURT: So I'm going to deny the objection. And when you make an objection, Mr. Collins, you have to give me a reason. And, Mr. NewDelman, you have to stop when he says objection. Okay?
BY MR. NEWDELMAN:
Q Who did you make that payment to?
A Mr. McDaniels.
Q And was that payment to Mr. McDaniel as far as you are concerned intended to be paid back to Collins?
A Yes, sir.
Q Let's look at Exhibit F, that's in evidence. That's the cashier's check.
A Yes.
Q Now, when you signed the promissory note, which is dated the 14th of December 2006, and you executed the deed that you received from Gibraltar out to Derrick Collins, that was also dated, notarized on the 14th of December. Was any money there ready to be presented to Gibraltar?

A At that time, no.
Q Okay. And if you look at the check that's in evidence there, do you see the date on that check?
A Yes, sir, I do.
Q And is that right underneath where it says $100,000? You see where there's a date there?
A Yes, sir, I do.
Q And what's the date of that?
A December 18th, 2006.
Q Okay. Happen to know what day of the week that was, if you recall?
A I believe it was a Monday.
Q And so this was the $100,000 that appears to have come out of Mr. Collins' inheritance as he's indicated that went for the investment that he was making with Gibraltar. Is that correct?
A Yes.
Q Okay. The check's not payable to Charlie Rose, is it?
A No, sir.
Q Not payable to you, is it?
A No, sir.
Q And it wasn't you or Charlie Rose that was pledging any of your properties.
A No, sir.
Q Okay.
MR. COLLINS: Your Honor, could I object to that last

question.

THE COURT: What's the basis of the objection, Mr. Collins?

MR. COLLINS: Because what he just said -- I was under the impression -- or I don't know if I'm supposed to say it. But when I went into the deal, I was under the impression that I was going in with Charlie Rose and Emmanuel Illuminardi.

THE COURT: Well, you can testify about that when it's your turn --

MR. COLLINS: Yes, ma'am.

THE COURT: -- to testify. But that -- you know, it's not really an objection to his testimony.

MR. COLLINS: Yeah. Sorry.

BY MR. NEWDELMAN:

Q Now, were you involved in any way that once these documents were signed on December 14th, were you involved in basically conveying the results of that meeting to Mr. Collins?

A No, sir.

Q Okay. As far as these instruments that you did sign, do you know if they were actually then conveyed or a copy provided to Mr. Collins?

A I was only told that they were.

Q Okay. And by whom?

A Mr. McDaniels.

Q Okay. But --

MR. COLLINS: Hearsay. Objection, Your Honor.

THE COURT: You know, it could be an admission against interest since it appears that your accountant was your agent. I'm going to overrule the objection.

BY MR. NEWDELMAN:

Q Okay. You would have no reason to believe that Mr. Collins, their agent, would not have given him the documentations that were signed in his presence, would you?

A No, sir.

Q Okay. When April 14th, 2007 passed, were you in a financial position to pay this Note back?

A Actually, at that point, I was no longer in position. I had just lost everything.

Q Have you ever filed bankruptcy?

A No, sir.

Q Okay. So this debt's never been discharged legally through a bankruptcy process?

A I've always paid my debts.

Q Okay. Let me just take one minute to see if there's something else that you would have the knowledge of.

Were you aware of some title at all that was being worked on on behalf of Gibraltar at or about the time of this transaction?

A I was. That's the only reason I gave my word that it would be paid. I was very knowledgeable as to where that

research was and how quickly it was pending to be issued.
Q Tell me how you gained knowledge of any research regarding the title to this property.
A I spent over 12 hours on the phone with Lee Sheehy from Gateway LandAmerica. Went over the title reports. Went over his research that he had done to date for that property. And was assured that they were in process of putting together a binder to insure that property.
Q All right. Take a look, then, at Exhibit G. You were referring to a Lee Sheehy from LandAmerica. Is that correct?
A Correct.
Q And this LandAmerica document dated December 29, 2006, appears to be under her direction. Is that correct?
A His.
Q Okay.
MRS. COLLINS: What document?
MR. NEWDELMAN: That's Exhibit G.
MR. COLLINS: G. Sorry. It's not marked, Mr. NewDelman. The exhibit's not marked.
THE COURT: It hasn't been admitted yet. Exhibit G is in the book. Are you saying it wasn't disclosed to you? Okay. Mr. Collins, do you have Exhibit G in front of you?
MRS. COLLINS: I'm looking for it. It hasn't been marked so I'm looking for it.
THE COURT: All of the exhibits have been marked.

MR. COLLINS: Yes, ma'am.

MR. NEWDELMAN: That's not it. Huh-uh. No.

THE COURT: Didn't he mark all of Debtor's exhibits?

THE CLERK: There's a copy -- a binder just like yours on the witness stand.

MRS. COLLINS: When is it dated?

THE CLERK: I don't know what she received.

MR. NEWDELMAN: December 29th of '06. That's it.

MRS. COLLINS: Okay.

MR. NEWDELMAN: She has it.

THE COURT: Okay. Now, Mr. Collins, do you have the exhibit in front of you?

MR. COLLINS: Yes.

THE COURT: Okay. All right. Mr. NewDelman, you may proceed.

BY MR. NEWDELMAN:

Q Now, I don't want to ask you anything to do with the truth of the matter stated in this letter. The truth of the matter. But you just testified that you knew there was some title work being done by LandAmerica. Is that correct?

A That is correct.

Q And what is the date that is on this letter from LandAmerica?

A December 29th, 2006.

Q And this letter is addressed to whom?

A Gibraltar Properties.
Q Okay. And Gibraltar Properties is not here today. Correct?
A Correct.
Q Neither is LandAmerica. Right?
A Correct.
Q Okay. This letter does refer does it not, though, to the particular parcel that's in the promissory note and the deed that you signed, does it not? The third line down.
A It does, yes.
Q Okay. And your testimony is today that you were aware that Gibraltar was in some transactions to acquire, obtain or complete the title work on these properties, including the property in question. You knew that.
A I would have never signed for that much money knowing that there was nothing there to support it.
Q And you knew that LandAmerica was basically working on the project?
A I.e., Mr. Sheahy confirmed to me that he was in the process and the binder would be prepared shortly.
Q Okay.
MR. NEWDELMAN: Now, I'm going to move to admit Exhibit G.
THE COURT: On what basis, Mr. NewDelman?
MR. NEWDELMAN: Is your objection or --

THE COURT: Don't push it, Mr. NewDelman.

MR. NEWDELMAN: Well, you --

THE COURT: On what basis?

MR. NEWDELMAN: Assume there was an objection. On the basis of --

THE COURT: You can assume there was --

MR. NEWDELMAN: Present state of mind. Present sense.

THE COURT: I'll admit it for the state of mind of the witness regarding --

MR. NEWDELMAN: What he knew --

THE COURT: -- what his state of mind was when he signed the Note.

MR. NEWDELMAN: That's correct.

THE COURT: On that basis --

MR. NEWDELMAN: That's the only way that would come in --

THE COURT: -- Mr. NewDelman, I will admit the exhibit.

MR. NEWDELMAN: -- is present state of mind. Okay.

(Exhibit G Received)

BY MR. NEWDELMAN:

Q So when you put your life on the line on a promissory note, you knew that there was some real estate behind the deed that you were signing to Mr. Collins. Correct?

A That is correct.
Q Okay. That was also in reliance, was it not, on what you were being informed by Gibraltar?
A Correct.
Q All right. And the relationship you had build up with Gibraltar and Mr. Thompson.
A Correct.
Q Okay. Did you personally ever represent to the Collins what you owned this property?
A Never.
Q Were you ever in a room with Mr. Rose when he indicated to the Collins that he owned this property?
A Never.
Q Now, let's look at Exhibit H. See it?
A Yes, sir.
Q Okay. Dated December 14th, 2006. That's the same date as the promissory note?
A Yes, sir.
Q It bears your signature, doesn't it?
A Yes, it does.
MRS. COLLINS: Excuse me.
THE WITNESS: It does.
BY MR. NEWDELMAN:
Q It does. Okay. Tell me, what was this document for? What was it intended to mean?

A Well, although I signed for the security and the collateral of the property, the loan was always intended for Gibraltar Properties and I signed over the check to them so that it was made from Mr. Collins to Gibraltar Properties, never coming either to myself or Mr. Rose, to which the check was indeed made out to Gibraltar Properties.

Q Manny, did you receive any benefits of that $100,000?

A I did receive some money that was owed to me for prior work.

Q That Gibraltar owed you?

A That is correct.

Q How much?

A Twenty thousand.

Q Twenty thousand?

A Correct.

Q Okay. Do you know whether it was from this same source of funds or -- do you know that? Whether -- or -- well, let me strike it. Did you get your 20,000 that was owed to from Gibraltar?

A I did.

Q And was the 20,000 in connection with work you were doing on a finder fee here or for some other work you may have been doing?

A Both.

Q Both. Could you separate how much work you thought you

earned as a result of bringing the parties together for this transaction?

A Half.

Q Ten thousand of the twenty you received from Gibraltar was making the arrangements with your contact with Mr. McDaniels to bring Collins into the picture?

A As well as signing for the loan, yes.

Q Okay. When were you paid?

A Shortly after he received the check.

Q Okay.

A Or Gibraltar Properties.

Q Okay.

MR. NEWDELMAN: I move to admit Exhibit H.

THE COURT: Any objection to Exhibit H, Mr. Collins?

MR. COLLINS: No, ma'am.

THE COURT: Exhibit H is admitted by agreement.

(Exhibit H Received)

BY MR. NEWDELMAN:

Q Now, let's look at Exhibit I which is in evidence.

MRS. COLLINS: Exhibit H is --

THE COURT: Ms. Collins, I've already admitted the exhibit.

MRS. COLLINS: Okay. Which is --

THE COURT: No. That --

//

BY MR. NEWDELMAN:

Q Manny, would you look at I that's in evidence --

THE COURT: Okay. I want to make sure, though, in all fairness, Mr. NewDelman, you didn't give them a book of your marked exhibits?

MR. NEWDELMAN: Do they have my book? Yeah, they had --

THE COURT: They can't seem to find your exhibits.

MRS. COLLINS: Nothing.

MR. COLLINS: Nothing. I can't find anything.

MR. NEWDELMAN: They're all there. I can come over --

MR. COLLINS: No, they're not marked.

MRS. COLLINS: They're marked on your front page -- sheet, but not on the actual pages. So I have to thumb through and find out what you guys are talking about.

THE COURT: Show them Exhibit H, Mr. NewDelman.

MR. NEWDELMAN: That's Exhibit I.

THE COURT: I'm sorry.

MR. NEWDELMAN: And it's in evidence. And we have a table of contents there. And actually she can use mine if she wants. It's this one. It's the deed from New Hope to Gibraltar that we were talking about today.

MRS. COLLINS: Okay. Okay.

MR. NEWDELMAN: Got it?

MRS. COLLINS: Yeah.

THE COURT: Okay. Can you -- before we go any further, can the Collins -- do you understand how to find the exhibits?

MR. COLLINS: No, I don't.

THE COURT: All right. Mr. NewDelman, go over there and show them the table of contents and where your exhibits are. Because I'm not going to stop for every one of these. They're -- you know -- let's be clear about what's required. Every exhibit has been marked is on the witness bench. There should have been a copy provided to you and apparently there was. But you are struggling to track --

MRS. COLLINS: It has a table of contents, but it's not marked.

MR. COLLINS: It has a table of contents, ma'am. Each page is not marked.

THE COURT: Well, each page doesn't have to be marked. But each exhibit should be marked, Mr. NewDelman.

MR. NEWDELMAN: Right. And they're all Bates stamped as well.

THE COURT: Well, Bates stamped doesn't help them when we talk about a letter exhibit. Do you have dividers between the exhibits for them?

MR. NEWDELMAN: Well --

MRS. COLLINS: Let me just mark --

MR. NEWDELMAN: -- the way we sent it to them was, I think, in an email attachment, is how we got the documents to them.

THE COURT: Okay.

MR. NEWDELMAN: And they basically did this. That's how we've been exchanging it. So I'm sure they're having difficulty. My problem on our--

THE COURT: Everybody's having a problem.

MR. NEWDELMAN: Yeah.

THE COURT: I'm just saying, every single --

MR. NEWDELMAN: I'll help them find --

THE COURT: -- everyone is getting agitated and it's just taking up more and more time.

MR. NEWDELMAN: I know. Some of her documents she's pulled out of her package.

THE COURT: What exhibit are we on, Mr. NewDelman?

MR. NEWDELMAN: Mr. Collins, are you ready?

MR. COLLINS: Yes.

MR. NEWDELMAN: Are you ready, Your Honor?

THE COURT: I am.

BY MR. NEWDELMAN:

Q Exhibit I, Manny.

A Yes, sir.

Q That is a document that is already in evidence today. There is a deed from New Hope Trust to Gibraltar. Do you see

that?

A That is correct.

Q And I want you to look on the notary there on the bottom. The date of that document. What's the date in which it's dated?

A December 11th, 2006.

Q Okay. Now, with all absolute honesty here, did you know that that deed was recorded before December 14th? Or is this something you're seeing now at a later time?

A I've seen the date. I knew nothing about whether it was recorded or not --

Q But actually the recording, as you see -- not to get anybody confused -- the recording actually looks like January 18th of '07. Is that correct?

A Correct.

Q But there is a deed from, it's look like, New Hope. And do you know who New Hope was?

A To my knowledge that was Dr. Rudd's trust.

Q New Hope is Rudd. Correct?

A Correct.

Q Okay. And you knew that?

A Yes.

Q Okay. You knew that.

A And when I saw this document, it was not stamped with the recorder's --

Q Got it. But the question for today is were you aware of this California Grant Deed which includes the parcel that's in question, did you know that there was instrument dated about three days before the transaction? Did you know this document existed on December 14th?
A It's one of the reasons why I signed the loan.
Q So you had seen this document before?
A Yes, sir.
Q As well as being aware of the LandAmerica title work that they were doing.
A Correct.
Q As well as what you had taken in through an observation from information you would have received from Gibraltar.
A Correct.

MR. NEWDELMAN: I have no further questions for Mr. Illuminardi.

THE COURT: Okay. Mr. Collins, you may cross-examine Mr. Illuminardi. By that, I mean, you can ask him -- because you didn't declare him to be your witness, you can ask him questions related to what Mr. NewDelman asked him. Okay?

MR. COLLINS: Yes, ma'am.

THE COURT: Okay. Are you picking, Mr. --

CROSS-EXAMINATION

BY MR. COLLINS:
Q Mr. Illuminardi --

A Yes, sir.
Q -- did you sign the promissory note given to Derrick -- to me?
A I did sign the promissory note.
Q Did you attach a deed with the Note?
A I didn't attach anything with the Note.
Q Did you give me the deed?
A I did not give you the deed.
Q Did you hand me the deed and the promissory note on the same day?
A I did not hand you anything.
Q Are the legal owner of the land -- the title owner of the land?
A No, sir, I am not.
Q Do you have -- did you hand me the promissory note and the deed --
MR. NEWDELMAN: Objection. Asked and answered.
THE COURT: It's already been answered. I'm not going to have him answer it again. So objection sustained.
BY MR. COLLINS:
Q Did you give Gibraltar Properties -- did you give Gibraltar our check?
A I did not.
Q Why would sign to a deed that you never encumbered or had title to?

A The deed was transferred to me along with the loan documents to you all at the same time to your agent.

Q Why didn't you confirm the deed before you gave it to me?

A I did not give you the deed and the transaction was all handled at one time, at one moment. It was never meant for me to record the deed. It was meant for me to convey and transfer security to you. That was all.

Q Well, where did this transaction take place?

A Mr. McDaniels' office.

Q You and Rose and I went into no promise with Gibraltar. Why have you not paid my loan back?

A First off, I have not been for the last few years in a financial place to do so. I have never denied owing you the money. And it was always clear that the money was for the benefit of Gibraltar Properties. Otherwise the check would have been made out to me. And it was not. It was made out to Gibraltar Properties.

Q But that's not what you told me at the time that you -- that I presented you with it.

A I never told you anything. You never presented me with a check. It was presented to Mr. McDaniels.

Q At any time, did you make aware to me who Gibraltar Properties is?

A I made aware to Mr. McDaniels who Gibraltar Properties was.

Q Did you -- but to me, though. I'm the one that's giving you the money.
A I spoke to Mr. McDaniels.
Q No. Did you and Rose, by your own signatures, promise to pay my money back and if the property was not yours, why did you give me a grant deed as collateral?
A I never denied owing the money. I have never told you that I was not going to pay it. I have just not been in a position to do so. I gave my word that I would pay it if the deal did not go through.
Q But I got between me and you stipulating yourself that you wasn't going to pay me back the money.
A I also have recordings of you threatening me.
Q I have personal knowledge you came over my house with somebody with a pistol in your back --
A Well, you have to prove that.
Q So -- I mean, so --
THE COURT: All right.
THE WITNESS: You have to prove that.
THE COURT: All right. Mr. Collins --
MR. COLLINS: Yes, ma'am.
THE COURT: -- this is not an opportunity for you to shout at the witness.
MR. COLLINS: I'm not trying to, ma'am. I'm not trying to.

THE COURT: If I had to admonish you again, Mr. Collins, then there will be repercussions. I understand you're upset --

MR. COLLINS: Yes, ma'am.

THE COURT: -- and I understand you're angry.

MR. COLLINS: I'm trying the best I can, ma'am. I'm just trying.

THE COURT: I understand that, Mr. Collins. But you still have to comply with the rules.

MR. COLLINS: Yes, ma'am, I'm trying.

THE COURT: All right.

THE CLERK: The witness needs to move his mic a little closer to him.

THE COURT: Yeah. You need to get closer to the microphone, sir.

THE WITNESS: Okay.

BY MR. COLLINS:

Q Mr. Illuminardi --

A Yes.

Q -- is Gibraltar Properties on my promissory note?

A I don't believe so.

Q Did I go into agreement with Gibraltar Properties --

A You went into --

Q -- according to the Note?

A You went into an agreement with me and Mr. Rose on behalf

of Gibraltar Properties.

Q Do you have any documentation showing Gibraltar owns title?

A I have the same documentation that's been presented here today.

Q Do you have any government documentation?

A Why would I need government documentation?

Q Showing legal title to the property.

THE COURT: The witness is not to argue with the Plaintiff. No argument.

THE WITNESS: I don't know how to 4.

THE COURT: Mr. Collins, it's quarter of four. One of the things I have to do is I have to manage the time for the trial. And you still want to testify. And you've come over from California.

MR. COLLINS: Yes, ma'am.

THE COURT: And I can't continue this trial tomorrow, I don't think. And I know if Mr. NewDelman or his witnesses are available. So -- and I can't keep my staff here past 5:30. And even with that, I'm keeping them an hour beyond time. So I'll allow you two more questions of this witness. And then I'm going to make sure Mr. NewDelman doesn't have any brief redirect. And then we are going to be done with this witness. And I'm going to have you come testify. Okay?

MR. COLLINS: Yes.

THE COURT: So you have two more questions.

BY MR. COLLINS:

Q Do you have any proof payment that you made?

A No, I do not.

Q If my money was to go to an investment, why did you get my money?

A I did not get your money.

THE COURT: All right. That's all the questions, Mr. Collins. Mr. NewDelman.

REDIRECT EXAMINATION

BY MR. NEWDELMAN:

Q Mr. Collins, I think, was indicating that conversations -- any conversations with him, but I believe you testified, Manny -- correct me if I'm wrong -- you did not meet Mr. Collins on December 14th, 2006, did you?

A No, sir.

Q You have any conversation with him at all prior him departing with $100,000 of his money?

A There was one telephone conversation where we discussed making the check out to Gibraltar Properties. And that was it. There was no other physical, face-to-face. There was a telephone conversation.

Q And when did that take place?

A I believe it a day or two after the Note was signed.

Q Okay. And is there a reason why you participated in that

phone call and not Mr. McDaniels?
A I was present with Mr. McDaniels. He was waiting for the check from Mr. Collins.
Q Okay. And is that -- and was there any other discussion you had with Mr. Collins other than the check is to be made payable to Gibraltar?
A Not at that time.
Q Is there anything you said to him that would indicate that this property belonged to not you, but to Gibraltar?
A It's always been clear that it's Gibraltar's property.
Q All right. Other than the conversation now that you're stating you had with Mr. Collins around the same date, right, December 14th of '06? When was the next time you had any conversation with Mr. Collins other than until the Note matured?
A After the default.
Q After default. Okay. All your arrangements, contacts were pretty much through -- your contact --
THE COURT: Mr. NewDelman --
BY MR. NEWDELMAN:
Q -- was Mac --
THE COURT: -- one question doesn't mean you can lead the witness for --
MR. NEWDELMAN: I'm sorry. I'll --
//

BY MR. NEWDELMAN:

Q The only contact was with Mac McDaniel, then?

A Right.

MRS. COLLINS: We didn't get that opportunity.

THE COURT: All right. The witness may step down. The witness is excused.

MRS. COLLINS: Thank you, Your Honor.

THE COURT: Okay. Mr. Collins, please come forward and be sworn. You're going to testify here. Your testimony about this transaction. So you have to be sworn by the courtroom deputy first, sir. Mr. Collins, right here. Thank you.

DERRICK COLLINS, PLAINTIFF, SWORN

THE COURT: Okay. Mr. Collins, you sit right there. Mrs. Collins, I'm going to have to admonish you again that you may not ask questions.

MRS. COLLINS: Okay.

THE COURT: Okay?

MRS. COLLINS: Okay.

THE COURT: Mr. Collins is going to have to do the best he can. I'll probably ask him a few questions, which will make Mr. NewDelman pretty unhappy.

Mr. Collins, this is your time to testify. And because you're representing yourself, I'm going to give you a little bit of leeway. But I can't give you full leeway. But

you can now provide whatever testimony you want -- you have all the documents in front of you -- about what you want to tell the Court about this transaction. All right?

TESTIMONY

THE WITNESS: When I explain -- I'm not too sure about the dates. I'm just -- is it just feasible --

THE COURT: You give me the best effort you can.

THE WITNESS: Is it feasible for me to just go along the way -- what happened? And just tell you, like, what happened?

THE COURT: Let's try that.

THE WITNESS: Is that acceptable, ma'am?

THE COURT: Let's try that. We'll see if Mr. NewDelman has an objection.

THE WITNESS: Okay. My name is Derrick Collins. It was -- I'm not sure about the date, but my grandfather had just died. I had just got an inheritance. I had been dealing with my tax accountant for over six years. His name is Mac McDaniels. I met him through a previous friend. Said he was a good tax man. He, in return, he did my taxes for over seven years. So when I encountered my inheritance from my grandfather, he knew that I had over a half million dollars in my checking account -- my savings account.

At the time the money was sitting in my checking account or my savings account, it wasn't bothering anybody. It

was just sitting there. He knew I had this money in there. He came at me with a deal. "Derrick, I got these two guys --" Which I never knew their names, never knew anything about the deal or anything. He just came at me and said it was land transaction deal. "You got $100,000 to invest. I can give you a turnaround of $50,000 within three months." I thought about it for a minute. I said, "Nah, I'm cool with it." Two days later, Mr. McDaniels called me again. More or less, like, basically he was, like, kind of harping me. Like, "Yeah, man, I still got this deal going on. You still in with it?" I said, "No. I'm not in with it." So I hung up again.

The third time I came by Mr. McDaniels' office was to pick up my income taxes because he had already prepared my taxes. And I was to pick up my -- sign my statements and stuff and send them out to IRS. At this time, he came to me again with this transaction and the deal. He said, "It's a good deal. I feel for it." I said, "Okay. Let me think about it. Let me go home. Let me think about it." He called me again later on that night. And I said, "Okay. It sounds like a good deal. I'm going to wake up in the morning. Before I go to work, I'm going to go to the bank" -- which is Washington Mutual "-- and I'm going to pull out the $100,000 that you needed with my $50,000 to be reimbursed to me after three months." My cutoff date was in April. He said, "No longer than April, you will get your money back." I said, "No

problem."

I went up to the bank that morning before I went to work. I call Mr. McDaniels. It was 9 -- like, 9:15, right after the bank opened. I call Mr. McDaniels. "Mac, what name do you want me to put this cashier's check in?" He said, "Put it in Gibraltar Properties." I said, "Spell it." He spelled it out because I didn't make a mishap on the check that I was going to write out to.

I got the check. I went straight to his office with all the money that I had. It was in an envelope. As soon as I opened the door, Mac was in the room, Emmanuel Illuminardi was in the room. I sat down. I gave Mac the check. McDaniels gave Illuminardi the check. Illuminardi gave me some paperwork, which was deeds and documents, promissory note and the California --

MRS. COLLINS: I'm going to --

THE COURT: Ms. Collins.

THE WITNESS: -- notary. It was -- and when I got that, I didn't even say two words to Illuminardi. I just got my -- cause I had to go to work. I said, "Mac, I'll call you later." Went to work. I haven't -- I talked to Mac, like, off and on, like, maybe a month, just to find out how things was going. He said, "Everything is going along fine. Everything is going on cool." "Okay." So when the third month came when I was supposed to get my money, I said, "Hey, Mac, what's going

on with the cash?" He was, like, "Hey, man, I've been trying to call these guys, Derrick. They're not calling me back." "All right. Well, keep going on what's going on."

So that third month turned into a fourth month. Now my cutoff date is gone. So now, my wife is, like, "What's wrong?" So I said -- well, I told her the deal that I went into with these guys, with McDaniels. She was like, "Well, let me see what they gave you." So I gave her the collateral and the stuff that they had given me. So at this time, I'm calling McDaniels. He's not even answering his phone now. Nobody's answering his phone. Illuminardi is not answering his phone. Mac's not answering his phone. So I went up to his job again to find out what's going on. So he's at his job. And I'm, like, "Man, what's going on with my cash?" "I don't even know, man. I think we got burned." I said, "What you mean we got burned?"

So at this point, I went back home. I told my wife what happened. She said, "Well, what did they give you?" And she gave me a -- the deed and the promissory note that encumbered from Mr. Illuminardi and McDaniels. And she called around. She called the assessor's office to try to find out if anything that they gave me was valid. She came to found out wasn't nothing valid, so I didn't have any collateral for my money that they had gave me.

So then in turn, I went back to McDaniels again.

Cause at this point, I'm calling a -- Mr. Illuminardi and we got into some exchanging words. And we got to starting threatening each other. And "If I see you, you know what's going to happen." So it got down to that point. So now it's like he's not coming around at all, period. So everything basically is falling on Mr. McDaniels because he's the only link to these people because I don't know them from any -- I don't know where they live. I don't know their -- all I have is just a telephone number. And all of a sudden the telephone numbers start getting cut off. So now I'm getting worried. And then my wife, she just got real upset. And she didn't know what was going on so she made a physical complaint with the L.A.'s Sherriff's Department.

MR. NEWDELMAN: Objection. Right now, Your Honor, as far as the cause of action is concerned, there's been not a comment from Mr. Collins as any involvement so far from the transaction through the default date on the Note of any contact whatsoever or communications between Mr. Collins and Mr. Rose. Anything beyond that point would just simply be irrelevant as far as the inducement to depart with $100,000 at the time of the transaction as a result of some form of a misrepresentation by Mr. Rose who never even met Mr. Collins.

THE COURT: Mr. NewDelman, that's the longest --

MR. NEWDELMAN: The longest objection --

THE COURT: -- evidentiary objection --

MR. NEWDELMAN: -- you've heard.

THE COURT: -- I've had in a long time.

MR. NEWDELMAN: But this is a high --

THE COURT: But I assume that your objection is that anything that occurs post-signing of the check -- signing of the Note is irrelevant to determining fraud.

MR. NEWDELMAN: As far as Mr. Rose and any representation or misrepresentation --

THE COURT: Okay.

MR. NEWDELMAN: -- or omission because he already indicated -- Collins -- he didn't even indicate that Rose was there when he dropped off the check. But again --

THE COURT: Well, Mr. NewDelman --

MR. NEWDELMAN: -- the objection --

THE COURT: -- I'm trying to understand the --

MR. NEWDELMAN: -- is relevancy --

THE COURT: -- objection.

MR. NEWDELMAN: Relevancy on the cause of action on what's plead after the transaction in question.

THE COURT: All right. Mr. Collins, what Mr. NewDelman is saying in order to decide if the debt is non-dischargeable, I have to determine if there was a fraud committed at the time that Mr. Rose signed the Note. So all the stuff that happens after Mr. Rose --

THE WITNESS: Yes, ma'am.

THE COURT: -- signed the Note is not going to tell me that. It's going to explain to me why you're so frustrated and why you're so upset --

THE WITNESS: Yes, ma'am.

THE COURT: -- and I think that there's some merit to making sure I'm aware of that. But I'm going to sustain the objection. And I want you to try to focus your testimony around what you understood the transaction to be.

THE WITNESS: Oh, okay.

THE COURT: All right? And there's been testimony here today where your testimony is different than the witness's testimony.

THE WITNESS: Yes, ma'am.

THE COURT: So, you know, why don't we talk about what your understanding of the transaction was.

THE WITNESS: Okay.

THE COURT: And you -- everyone concedes you haven't been paid.

THE WITNESS: Yes, ma'am.

THE COURT: And everybody concedes that you're owed the money. So you don't need to tell me that because nobody disputes that.

THE WITNESS: Okay.

THE COURT: Okay?

THE WITNESS: Okay.

THE COURT: All right. So with that admonition, is there anything else you want to tell me, because I'm the Court, about what your understanding was of this transaction?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: My understanding of this converse -- of this transaction through McDaniels and Illuminardi was that I was to encumber them with $100,000. I was to give them $100,000 collateral for some -- for a -- it was -- they were trying to get water rights for a township or something. And McDaniels had this chart all laid out and "This is what we're getting ready to buy. And this is our township right here. We trying to get the water rights. And we're going to --"

THE COURT: Well, let me ask you this --

THE WITNESS: Yes, ma'am.

THE COURT: -- Mr. Collins. You say certain documents were given to you by Mr. Illuminardi at this meeting --

THE WITNESS: Yes, ma'am.

THE COURT: -- which was -- the Note is dated December 14th.

THE WITNESS: Yes.

THE COURT: The cashier's check is dated December 16th --

MR. NEWDELMAN: Next day, 15th.

THE COURT: The 15th.

THE WITNESS: Okay. The day of the check --

THE COURT: So is --

THE WITNESS: -- that's when I took McDaniels the money.

THE COURT: Okay.

THE WITNESS: Illuminardi was there and McDaniels was there. I took the check --

THE COURT: Do you remember what -- can you look at the documents -- let's start with the Plaintiff's book. Do you recognize -- you were given the Note. You say you were given certain documents.

THE WITNESS: Yes, ma'am. I was given --

THE COURT: All right. Let's go over --

THE WITNESS: -- a promissory note and --

THE COURT: -- the --

THE WITNESS: -- a deed.

THE COURT: Okay. Let's -- so, look at the Plaintiff's exhibit book, the black book. Okay? And look --

THE WITNESS: Oh, the black book.

THE COURT: Yeah. Look at the black book for me.

THE WITNESS: Yes, ma'am.

THE COURT: Ms. Collins, just have a seat. It'll be all right.

MRS. COLLINS: Okay. I didn't know if he had to --

THE COURT: Believe me, Mr. NewDelman is much more unhappy that I'm talking now than you are.

Okay. Take a look at Exhibit A --

THE WITNESS: Yes, ma'am.

THE COURT: -- Mr. Collins.

THE WITNESS: Exhibit A.

THE COURT: Now, is that the Note? You said you were given a note on December 15th. Was this the Note that you were given?

THE WITNESS: Oh, I got it right here. Yes, ma'am. This is it right here.

THE COURT: All right. Take a look at Exhibit B.

THE WITNESS: Exhibit B.

THE COURT: Right. The next page.

THE WITNESS: Yes.

THE COURT: Okay. Were you given that document on December 15th, 2006? If you recall.

THE WITNESS: Is --

THE COURT: Just -- it's --

THE WITNESS: Ma'am, I have the original. I don't want to see yes until I see my original what they gave me and to compare this. Is this the original? Because I have the original document right there. And I just wanted to look at it before I say yes and then if they had changed anything or whatever.

THE COURT: Ms. Collins --

THE WITNESS: Yes, ma'am.

THE COURT: Ms. Collins, let me just see what the witness --

MRS. COLLINS: Okay.

THE COURT: Let Mr. NewDelman see it first.

MRS. COLLINS: Oh, okay.

THE WITNESS: I just want to be sure that this is the one.

MR. NEWDELMAN: That's the second of the two so --

MRS. COLLINS: Okay. This is the one she's discussing.

MR. NEWDELMAN: I understand. Let me see that again.

THE COURT: No, actually it's the first of the two.

MR. NEWDELMAN: This is actually --

MRS. COLLINS: This is Deed to Emmanuel --

MR. NEWDELMAN: This is actually C.

THE COURT: No. This is the deed from Gibraltar to Emmanuel.

MR. NEWDELMAN: But it's a copy though. It's not the original

THE COURT: Okay.

MRS. COLLINS: Okay. Let me get that for you.

THE COURT: Well, it's a simple question. Did he get -- all right. Let's start over. Did you mark these deeds as

an exhibit, Ms. Collins?

MRS. COLLINS: Yes.

MR. NEWDELMAN: B and C are both in evidence.

THE COURT: Yeah B and C are in evidence. Let's just go with that.

MR. NEWDELMAN: And so B is the first deed from Gibraltar --

THE COURT: Right. And the only question I'm asking him is he said he got a Note and some deeds. And I'm trying to figure out, are these the deeds you received?

THE WITNESS: I need to see my original paperwork before I say yes to this.

THE COURT: Well, it doesn't matter because the exhibit -- all right. Go ahead. Give him -- did you receive one or two deeds?

THE WITNESS: This is not it, ma'am.

THE COURT: Mr. Collins, slow down. On December 15th, 2006, how many deeds did you receive?

THE WITNESS: I received two. These two right here.

MRS. COLLINS: How many deeds she said

THE WITNESS: I mean, one deed.

THE COURT: One deed.

THE WITNESS: One deed and one promissory note, ma'am.

THE COURT: All right. And what was the deed? Was

the deed from Manny to you?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Would you look at Exhibit C, please.

THE WITNESS: Me? Exhibit C?

THE COURT: Yeah. Look at Exhibit C and compare that to your document.

THE WITNESS: And this is supposed to be my promissory note?

THE COURT: No, sir. It's supposed to be a deed from Manny to you. Exhibit C.

THE WITNESS: This right here.

THE COURT: In the exhibit book.

THE WITNESS: Yes.

THE COURT: Okay. Mr. Collins, take a look at this and tell me if that is a copy of the deed that you received with the promissory note.

THE WITNESS: Yes, ma'am.

THE COURT: All right. Take your original document back, Mrs. Collins, please.

MRS. COLLINS: Okay.

THE COURT: All right. Mr. Collins, did you receive any other paperwork on December 15th, 2006 other than the promissory note and Exhibit C?

THE WITNESS: No, ma'am.

THE COURT: Okay. So that's what you got. All right.

THE WITNESS: Yes.

THE COURT: All right. And your testimony is that -- okay. Did you ask for any other paperwork?

THE WITNESS: No, ma'am.

THE COURT: What was your understanding of what you were supposed to with the Note and the deed?

THE WITNESS: I was supposed to hold the Note and the deed for collateral for the three months and no longer than four months, ma'am. After I was to get my money back, I was to return the Note and the deed.

THE COURT: To whom?

THE WITNESS: Back to Mr. McDaniels, as far as I was concerned.

THE COURT: All right. And when you didn't get your money, what did -- did you -- let's start over. When you didn't get paid, what did you think you were supposed to do? What was your understanding if they didn't pay you, what were you supposed to do?

THE WITNESS: When I didn't get paid --

THE COURT: No. Not when it happened --

THE WITNESS: Right.

THE COURT: When you delivered the check and they gave you this paperwork --

THE WITNESS: Yes, ma'am.

THE COURT: -- what was your understanding of what you were supposed to do with this paperwork in the event you didn't get paid?

THE WITNESS: They never did say what I was supposed to do with the money -- what I was supposed to do with it, ma'am.

THE COURT: Okay.

THE WITNESS: They never did -- McDaniels never did say what it because when he gave -- when I gave him the money and Illuminardi gave me the paperwork, he walked out the door. I went to work. And I --

THE COURT: He who?

THE WITNESS: Mr. McDaniels still was in his office. I went back to work. I don't know what --

THE COURT: When you say he walked out the door, you're talking about --

THE WITNESS: I meant me. I walked out of the door.

THE COURT: Okay. All right.

THE WITNESS: Cause I had to go to work.

THE COURT: All right. Okay. All right. Is there anything else you want to tell me about your understanding about this transaction?

THE WITNESS: Yes, I do.

THE COURT: Okay.

THE WITNESS: When I gave McDaniels the money for collateral on the property that was given to me, he was telling me about how the deal -- he trusted Illuminardi and Rose because he went into previous dealings with them before. So I was -- okay. So more or less, like, McDaniels, he re -- how could I say it? He made -- he kind of reassured everything --

THE COURT: I under --

THE WITNESS: You know, he kind of reassured. Made sure, like -- you know, I relied on him, you know. Without him saying, like -- is this a cool deal? Cause other than that, you know, my money can stay in the bank. He said, "It's a cool deal. It's a for sure thing. I got it." "No problem, man. I'll go to the bank and on your word and on your say so, I'm going to do that. Other than that, I don't know him and I don't him." I wouldn't have gave them anything of my money. But my grandfather's money was sitting there. I didn't even need to use it. It's just sitting there. I just had it. So I don't know if it was a nest egg open for somebody for taking. I don't know. So that's what happened, ma'am.

And I was led to believe from that gentleman back there, Mr. Illuminardi, and Mr. McDaniels that it was a for sure thing. My money was going to be reimbursed to me no later than April 15th or before. And I said, "No problem." When I didn't get my money back, I grabbed up my deed and my Note. Actually, I tried to cash in on it to see if I can get -- you

know, to see if I could -- you know, if I had collateral or something like that -- well, they said my name was on it somewhere. So I'm going to see if it's recorded somewhere. It wasn't recorded. That's when I found out. My wife was like, "What's going on?" "I think I got took." That's what I said. And then she got to researching everything. And she found out. She kept calling McDaniels. McDaniels wasn't answering the phone. So that's when we made a criminal complaint.

THE COURT: Okay. Well, let me ask you one more question. When you didn't get the money and your wife got involved in all of this with you, did you present the deed, Exhibit C, to be recorded with the Imperial County Recorder?

THE WITNESS: We tried to. We tried, ma'am. And they --

THE COURT: When did you do that?

THE WITNESS: I don't have the date.

THE COURT: Okay.

MRS. COLLINS: May I answer?

THE COURT: So what -- Mrs. Collins.

MRS. COLLINS: Okay.

THE WITNESS: Don't worry about it.

THE COURT: When you -- you said you tried to and you couldn't get it done, do you have an exhibit here today that explains what happened when you submitted the deed for recording?

THE WITNESS: I don't know what exhibit number it is, ma'am. I --

MRS. COLLINS: It's --

THE COURT: Ms. Collins, do you know what exhibit number it is?

MRS. COLLINS: Yes.

THE COURT: All right. What exhibit number is it?

MRS. COLLINS: It is the exhibit letter that shows that the deed could not be recorded because it was a copy.

THE COURT: Is it exhibit -- Plaintiff's Exhibit 17?

MRS. COLLINS: It's going to be Exhibit --

THE COURT: It's one of the ones I know I wouldn't admit.

MRS. COLLINS: Yeah. I believe --

THE COURT: Let's look at it again.

MRS. COLLINS: Exhibit --

THE WITNESS: Yeah, we sent it to Imperial County a couple of times. And they sent it back to us. They said, "This is not the original copy. We need the original --"

THE COURT: Wait. Wait. Wait. Mr. Collins, I'm trying to find the deed.

THE WITNESS: Okay.

THE COURT: I mean, trying to find the exhibit.

MRS. COLLINS: It was the correspondence dated --

THE COURT: Is it this correspondence, Exhibit 18?

MRS. COLLINS: 8/10/2009.

THE COURT: What's the exhibit number?

MRS. COLLINS: It is --

THE WITNESS: Exhibit what?

MRS. COLLINS: Let me get it for you.

THE COURT: 8/10/2009 is Exhibit 7.

THE WITNESS: Exhibit 7?

THE COURT: All right. I think what I said was I wasn't going to admit this as a public document. So now, Mr. Collins --

THE WITNESS: Yes, ma'am.

THE COURT: I'm bad at names. Would you get Exhibit 7 in front of you please, sir.

THE WITNESS: Oh, I got -- my exhibits are numbered -- I mean, labeled from A, B, C.

THE COURT: No, you want to look at your exhibits. Do we have the Plaintiff's exhibits --

MRS. COLLINS: They're in a folder.

THE COURT: You look at the folder and find your Exhibit 7. Mr. NewDelman, do you have Exhibit 7?

THE CLERK: It has a red sticker on the top.

THE WITNESS: Yes, ma'am, I have it. I have it, yes, ma'am.

THE COURT: It's the letter dated --

THE WITNESS: Yes, ma'am.

THE COURT: -- or it's the transmission 8/10/2009. Okay. First of all, Mr. Collins, is the first time you submitted Exhibit C for recording August of 2009?

THE WITNESS: Yes.

THE COURT: All right. And when you submitted the deed for recording, is it your testimony you got this --

THE WITNESS: This is the letter that they sent me back, ma'am.

THE COURT: Okay. And they sent it back to you. And it says it's an incomplete document and it's a copy.

THE WITNESS: Yes.

THE COURT: And it says a preliminary change of ownership report is required to be completed. Correct?

THE WITNESS: Yes, ma'am.

THE COURT: All right.

THE WITNESS: And I have that same document in my possession right now what they gave me.

THE COURT: Well, this is what they gave you.

THE WITNESS: Yes.

THE COURT: So when you got this back in August of 2009, what did you do next?

THE WITNESS: We made a criminal investigation.

MR. NEWDELMAN: Objection.

THE COURT: You know that isn't -- what did you do to try to get the deed recorded? Was this the only time you

tried to submit the deed for recording was August of 2009?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. All right. Mr. NewDelman, I'm going to admit Exhibit Number 7. So make your objection now, sir, for the record.

MR. NEWDELMAN: As far as his inability to record that deed --

THE COURT: Well, I'm admitting --

MR. NEWDELMAN: -- I haven't --

THE COURT: I'm admitting the document because the witness has testified that he tried to record Exhibit C and this was what he got in return.

MR. NEWDELMAN: Yeah. And what he got in return, I got to find. But I remember seeing a document that just says it was a copy.

THE COURT: It is what it is, Mr. NewDelman. But if you have an objection to the admission of the exhibit.

MR. NEWDELMAN: I don't have one --

THE COURT: Okay. Exhibit 7 is admitted.

(Exhibit 7 Received)

THE COURT: Okay. All right. Mr. Collins, we're going to try to finish up your testimony today. So I want to make sure -- and you're going to get a chance on redirect, but Mr. NewDelman is going to get to ask you some questions, as you know. So is there anything else you want to tell me. I think

I understand that you got the Note --

THE WITNESS: Yes, ma'am.

THE COURT: -- you got the deed. And then when you didn't get paid in 2007, you did a number of different things. But the first time you tried to actually record the deed is August of 2009. Correct?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Okay.

THE WITNESS: I tried to actually see if I any type of collateral, you know. And then that's when I found out I didn't have anything.

THE COURT: Okay. Is there anything else you want to tell me?

THE WITNESS: No, ma'am, that about sums it up.

THE COURT: Okay. Mr. NewDelman, cross-examination.

MR. NEWDELMAN: Your Honor, I can go ahead on my cross-examination, but I believe basically if he has no other witnesses to call right now, at this point in time, I think he hasn't met any of the elements to establish a 523(a)(2). I can go ahead and take a half an hour, 45 minutes with him, but if he doesn't have any --

THE COURT: Are you going to call --

MR. NEWDELMAN: -- anything else to ask, I don't know what he's proven so far.

THE COURT: Let me look at the witness list. You

know --

MR. NEWDELMAN: I move for just dismissal.

THE COURT: You're moving for a directed verdict. Let me just take a look at -- how about -- Mr. Collins called himself. I have a supplemental witness list.

Ms. Collins, I know you've been doing all the heavy lifting here. Did you file the original witness list a while back?

MRS. COLLINS: Yes, I did.

THE COURT: All right. Do you know approximately when you filed that or do you have a copy of that with you here today? Your original witness list.

MRS. COLLINS: I believe so, yes.

THE COURT: In any event, Mr. NewDelman, I'm not going to grant your motion for a direct verdict. So let's move on.

MR. NEWDELMAN: Okay. You want me to start?

THE COURT: Yes. The motion for directed verdict is denied.

MR. NEWDELMAN: Without prejudice.

THE COURT: Of course.

CROSS-EXAMINATION

BY MR. NEWDELMAN:

Q Mr. Collins, you haven't been paid your $150,000, have you?

A No, sir.
Q Have you made a demand for payment upon your agent, Mr. McDaniels? Have you made demands upon Mac?
A No, sir.
Q Has Mac paid you any money back?
A No, sir.
Q Mac hasn't --
THE COURT: Ms. Collins.
BY MR. NEWDELMAN:
Q Mac hasn't paid you $25,000, sir?
A For what?
Q Because of this transaction?
A No, sir.
Q If Mr. McDaniels would have told me he paid you back $25,000, is he lying?
A Yes, sir.
Q He never turned over any money that Manny paid to him for your benefit?
A No, sir.
Q Let me show you a copy of the proof of claim that you filed in this bankruptcy --
A Uh-huh.
Q -- which is not a trial exhibit, but it's a document filed in this bankruptcy case. You filed a claim in this bankruptcy for $150,000. Is that correct?

A Yes, sir.
Q And you see the box about -- in the middle of that page -- where you said this obligation owed to you is secured. Is that correct? Secured?
A It's what it looks like.
Q Okay. Is it secured by any property that's owned by Mr. Charlie Rose?
A I have no idea.
Q Okay. Were you ever given any deeds at all encumbering or putting a lien on any property owned by Mr. Rose? Do you have any deeds that Mr. Rose pledged you any property?
A No, sir.
Q Okay. You understood that the property that you were going to get an interest in, whatever that interest may be, was going to be property that would be belonging to a company called Gibraltar Properties, LLC. Is that correct?
A No, sir.
Q Okay. Whose property were you going to take a property on?
A I had no idea. What do you mean whose property was I was going to take a lien on? From this Note right here?
Q From your Note, yes.
A Oh. What I was led to believe whatever the Note said, that's who I was going after.
Q But you were handed a deed to a piece of property --

correct? -- on the day you handed over $100,000? You were handed an instrument that appeared to say grant deed on it?
A I was handed a promissory note and a grant deed.
Q And the deed we're talking about happens to be Exhibit C that's in the black notebook. Is that correct?
A Yes, sir.
Q That's the Illuminardi to Collins deed. Is that correct?
A Yes, sir.
Q Okay. And it had a legal description of Section 1 through 15, 17 through 35 of Township 11 South Range 18 East. Correct? Had a legal?
A Yes.
Q Okay. You see on this document that you were handed -- well, let me strike that. Who handed you this document?
A Illuminardi.
Q All right. Was Mr. Rose there?
A No, sir.
Q Did you meet Mr. Rose at any time before --
A Never met Mr. Rose before in my life.
Q So during all of these transactions, before you departed with $100,000, you did not meet Mr. Rose. Correct?
A I heard Mr. Rose on a telephone conversation. But I've never met him, no.
Q Did Mr. Rose ever make a statement to you indicating that he was going to secure your loan by his property?

A Yes, sir. He told me that in our conversation. He said that he was going to make sure that I got my money back.
Q I'm talking about December 14th, 2006. What did -- did you have any conversations at all before you departed with your money on December 15th -- but the Note is dated December 14th -- did you ever speak to Mr. Rose at all about this transaction?
A No, sir.
Q When you're talking about he promised to pay you, he listed you in his bankruptcy case, did he not?
A Yes, sir.
Q And you filed a claim in this bankruptcy, did you not?
A Yes, sir.
Q Have you read Mr. Rose's plan of reorganization in this case?
A I wasn't involved in that plan, sir.
Q Have you received a copy of the plan?
A No, I haven't. I don't think I have.
Q Okay. You get other mails that I've issued periodically regarding this bankruptcy case?
A I only got one stipulation stipulating that he was going out on bankruptcy and it didn't stipulate what he owed me for. That's why I'm here today.
Q Okay. Mr. Collins, you understand you're under oath?
A Yes, sir.

Q You understand the significance of being under oath?
A Yes, sir.
Q You understand that's a federal crime, perjury?
A Yes, sir.
Q If I was to inform you that Mr. McDaniels is reporting that you in fact -- he has cashier's checks that you had signed in paying you back $25,000 would your statement still be today that you received nothing back from your investment?
A Not from this case, sir.
Q You did receive money back from Mr. McDaniels?
A And I have every cancelled check and on each check, it doesn't have anything that is the loan repayment or anything.
Q How much money have you received back from Mr. --
A I have no idea. My wife has all the records.
Q Okay. Okay. So you want to clarify, but your position is you have received money back from Mr. McDaniel but you don't believe it has anything to do with this transaction?
A I know it doesn't have anything to do with this transaction.
Q Okay. Just want to make sure you don't get yourself into a jam.
A I'm not getting into any trouble.
Q All right. Now, you tell me, what statements my client, Mr. Rose, made to you before December 14th in regards to the loan and any promises that property would be -- your investment

would be collateralized by property. Conversations that you would have had with Mr. Rose.

A I've never had a conversation with Mr. Rose, sir.

Q Okay. And you heard Mr. Rose testify when you asked him, he admits he owes 150,000 under that Note. Is that correct?

A That's what he says.

Q He listed you in your (sic) bankruptcy, did he not? That's why you're here.

A Over three years ago, yes, sir. I'm still waiting.

Q You indicated when you went down there that morning, you were rushed to get to work and you handed in your cashier's check. That was at whose office?

A Mac McDaniels' office. My tax accountant.

Q And you handed the check to whom?

A I handed the check to Mac McDaniels.

Q And who handed you back Exhibit C, the grant deed? Who handed that back to you?

A Illuminardi.

Q And Illuminardi is the gentleman that's in the courtroom?

A Yes, sir.

Q Is Illuminardi's name is the name that's on Exhibit C as signing it?

A Emmanuel Illuminardi, yes, sir.

Q On Exhibit C, is there a signature anywhere on Exhibit C from my client, Mr. Rose?

A Am I looking at the wrong one?

Q The black notebook, Number C.

A Oh, okay.

Q There's a tab and a green sheet. That's the Emmanuel transfer to you.

A On the grant deed. Right?

Q Yeah. Is --

A No. Mr. Rose's name is not on here.

Q Okay.

MR. NEWDELMAN: Your Honor, I don't have any further questions for him.

THE COURT: Okay. Mr. Collins --

THE WITNESS: Yes, ma'am.

THE COURT: -- the money you've received back -- or you've been getting checks from Mr. McDaniel. Is that right?

THE WITNESS: Pardon me?

THE COURT: You've gotten some checks from Mr. McDaniel?

THE WITNESS: Yes, I've received a few checks from Mr. McDaniels, yes, ma'am.

THE COURT: And what are those for?

THE WITNESS: Basically, when Mr. McDaniels gave me those checks, he indicated that "Derrick, I know these guys have taken you for this money. I'm going to give you some of this money because I know they've been taking money. They're

hiding from me. I got to give you something." He felt obligated to give me something until we discuss -- until we find out what's going on with these guys that are not giving me my money. So basically, ma'am, he was caught in the middle. I'm calling him every day, "Where's my money at?" Basically, I'm disrupting his business because I'm coming in there talking loud and, you know, just --

THE COURT: Okay.

THE WITNESS: So he -- basically, it was hush money, ma'am, to me.

THE COURT: All right. Mr. Collins, is there anything else you want to talk to me about with respect to this transaction?

THE WITNESS: No, ma'am.

THE COURT: Okay. You can step down. All right. I'm going to take the matter under advisement, but I want everybody to be clear about what I'm going to be focused on. The only issue in front of me -- because there's been no demonstration -- couple of things that, just as a matter of law, I can find today.

In order to prevail, the Collins have to prove by a preponderance of the evidence that Mr. Rose obtained money from Mr. Collins by false pretences, a false representation, or actual fraud. Actual fraud is very difficult to prove and it has not been proven here today.

The issue that I have to determine is whether at the time that Mr. Rose signed the Note the statement that the Note is secured by the real property was a false representation. That is the only thing left for me to decide.

I'll take a look at all the evidence. I'll take a look at all the exhibits. And I'll issue a decision in the next 60 days.

MR. NEWDELMAN: You have to remember, though, we have an issue here. Mr. Rose hasn't testified.

THE COURT: Well, do you want to call him to testify?

MR. NEWDELMAN: Well, they haven't rested their case yet. And --

THE COURT: I'm sorry.

MR. NEWDELMAN: And I asked you if you wanted me to do my direct of Mr. Rose --

THE COURT: And I told you --

MR. NEWDELMAN: -- and you said, "No. Later."

THE COURT: Okay.

MR. NEWDELMAN: And that's why I moved for --

THE COURT: So you don't want me to close the evidence. Let's finish it.

MR. NEWDELMAN: That's why I moved for directed verdict.

THE COURT: Mr. Collins, do you have any other witnesses here today?

MR. COLLINS: No, ma'am.
THE COURT: All right.
MR. NEWDELMAN: I just didn't want to have Mr. --
THE COURT: No, I had assumed --
MR. NEWDELMAN: -- testify --
MR. COLLINS: We're done.
THE COURT: Because I had assumed the way you were behaving you didn't -- and my bad, Mr. NewDelman --
MR. NEWDELMAN: Right. But --
THE COURT: -- I assumed you didn't want to recall your client.
MR. NEWDELMAN: -- if you -- yeah. And if you didn't feel that what's been presented to you --
THE COURT: I'm not going to grant a directed verdict.
MR. NEWDELMAN: -- based on -- I think Mr. Rose needs to take the witness stand. Otherwise.
THE COURT: That's fine. The issue really is whether or not -- because, you know, the testimony now has narrowed the issue down to what was happening at the time that the loan was made. The question is, is this a false representation.
Mr. Rose, retake the stand. That means, Mr. Collins, you'll get a chance to ask him questions again. All right? But we're going to finish today, Mr. NewDelman. We are going to finish today.

MR. NEWDELMAN: I'll keep this short --

THE COURT: Because we're going to walk out of here at 5:30. The trial will be over.

MR. NEWDELMAN: There's a game at 6:00.

THE COURT: Well, you sure are optimistic. All right.

CHARLES ROSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. NEWDELMAN:

Q Mr. Rose, what is your occupation?

A I'm a construction consultant.

Q And describe what does that do? What do you do?

A In the insurance restoration industry, I go to natural disasters worldwide and I advise people on two things. Number one, I advise them on how to get the properties either repaired or condemned. And if so, if they're to be repaired, how to do it in the shortest period of time.

Q Thanks. So your earnings is like bankruptcy lawyer. You kind of capitalize on everyone else's crisis.

A I try to make a bad thing into a good thing if I can.

Q Okay. Where are you working currently?

A I'm in Chile. Santiago and Concepcion.

Q Okay. And how long have you been down in Chile?

A Back and forth since February 27th. I had a recent stint of about 28 days ending last Sunday. And I'm scheduled to back

there on Monday of next week for 75 days.
Q So it's a long tour of duty down in Chile.
A Yes. It's arduous. Yes.
Q Is that because of their earthquakes?
A Yes. They had a 8.8 temblor 70 miles south of Concepcion.
Q Okay. So it's fair to say that like a weather chaser, you're chasing storms and natural disasters after they happen, to do the type of work you do.
A Thankfully by invitation, but yes, I do chase.
Q By invitation. Okay. You did not -- I don't want to put words in your mouth. Why did you file the bankruptcy? This Chapter 11?
A Well, I had a couple of difficult years collecting money that was owed to me. And the culmination of that in Tahoe basically put me into Chapter 11.
Q You did not file bankruptcy because of the Collins' matter, did you?
A No, actually, to save my house.
Q Okay. And you're still working on the -- actually you just reached an agreement, have you not, on a cure and maintain with the lender?
A Just sent them a second payment for the month, just today, as a matter of fact.
Q So you already started a half -- a payment doing half the month -- a regular payment and a catch up payment?

A Exactly. Correct.
Q Super. Okay. You also had some domestics relations issues, did you not, that needed to be rectified?
A Yes.
Q Support obligations?
A Yeah. Those are being worked on as we speak.
Q Okay. Automobiles. Those issues have been worked out in your Chapter 11, as well, by now?
A Completely. In fact, I guess, Powerball (sic) actually lost one of my checks unfortunately.
Q Your plan's ready for confirmation, isn't it?
A Yeah.
Q Okay. Despite this issue here, the plan is still ready for confirmation, is it not?
A Happily so, after three years, yeah.
Q Okay. Mr. Collins is listed. You listed him as one of your creditor, right, in your bankruptcy?
A And he remains a payee, yes.
Q Yeah. But he's a general, unsecured creditor?
A Correct.
Q Are you aware that this week you filed to my office an objection to Mr. Collins' proof of claim? Are you aware of that?
A I believe only as to the security of it, not the amount.
Q That's right. So you basically just -- you just objected

on the basis that none of your property or the estate property was pledged. But the debt was fine as 150 because you signed a Note.

A I did sign that Note, yes.

Q So it was only limited. It was not a secured claim.

A Correct.

Q Got it. Okay. Now, like I did with Manny, and let's keep this brief, because we all want to get out of here. What is your connection with Mac McDaniels?

A I was introduced to him through Emmanuel Illuminardi.

Q Okay. How many years before the transaction in question?

A Years?

Q Any time?

A Moments. Moments actually.

Q Oh, so this was your first deal with Mac?

A The very first and the last, yes.

Q Okay. Got it. Understood. So the relationship with Mac was Manny's relationship with Mac?

A That is correct.

Q Got it. Your relationship with Gibraltar?

A I had worked for Gibraltar in Los Angeles on a property on 23rd Avenue for Jealous (sic) Henderson and Traveler's Insurance. I had also worked for Mr. Thompson as Gibraltar in the Freeport, Grand Bahamas area on a -- essentially a hurricane loss, but also wave wash, which was a -- turned out

to be a 5,900-page report for $14 million that we submitted and now rests in the Supreme Court of the Grand Bahamas.

Q What did you understand the nature of Gibraltar's work to be?

A Gibraltar is primarily an insurance restoration consultant in the -- what they call the public adjusting sector. But Gibraltar as a division is handling property in the sense that they buy and sell property. They deal with investment property.

Q Do -- have you ever been an employee of Gibraltar in the true sense of being an employee?

A I've only been a contract -- essentially a contract on a case-by-case basis. Once for Jealous Henderson. Once for the Freeport, Grand Bahamas job. That's it.

Q Before December 14th of 2006, about how many projects have you worked for Gibraltar?

A Specifically three.

Q Three? Uh-huh. Okay. At the time of the transaction in question, were you owed any money by Gibraltar?

A Yes. There is a project, again, Freeport, Grand Bahamas, I'm owed a considerable sum of money, as soon as that pencils out in court. And then on Jeramous Henderson, that's actually going through a litigation mode with Zorik Morami who's taking it as a class action lawsuit now.

Q Do you know the nature of Gibraltar's business?

Corporation?  LLC?  Do you know anything about them?
A    Just what I've seen on the public record.
Q    Okay.  I think we have an actual document here as well that we might as well get in.  Look at Exhibit D.
A    I have it.
Q    Now, that is from a website.  Did you provide that document to me?
A    Actually I had my attorney pull this up, another attorney.
Q    Okay.  And as far as you know, is this information true and correct, it's a Nevada LLC?
A    This is what appears in the public record as of now, yes.
Q    From your own personal knowledge though --
A    From my own personal knowledge, yes, I have checked this.
Q    And who are the managers or members of the LLC?
A    It lists a Derrick J. Fincher and Anthony Thompson.
Q    Do you know a Mr. Fincher as well?
A    I do.
Q    Okay.  Have you -- part of your projects, were you basically working with Fincher as well?
A    I met Derrick Fincher actually in Florida, near Pensacola, Florida in 2005.
Q    Now, for today's purpose, do you have any equity ownership, any financial ownership whatsoever of any nature with Gibraltar Properties IV LLC?
A    Neither ownership nor control.

Q Okay. Are you doing any work with them or have you done any work for them since December 14th of '06?
A No, not for Gibraltar.
Q Okay. Understood. Okay. Now, when was the first time you met Mr. Collins?
A This is a little bit hard to remember, but I do know that I spent one afternoon with -- I believe Mac was there and Manny Illuminardi was there. And we had gone to Mr. Collins' home to discuss this debt.
Q This is after the fact?
A I'm going to say late 2008 or early 2009.
Q Years after the fact?
A Yes. Many, many months.
Q Okay. To try to resolve a problem --
A Yes.
Q -- on your Note?
A Yes, on the debt that I owe him.
Q You ever talk to Gibraltar about making this payment back to them?
A Actually I haven't had much contact with Gibraltar Properties or Mr. Thompson. I spent most of -- well, I was home 28 days in 2008 -- from September 2008 to late '09, I was in Houston, Texas.
Q Now, in connection with the property that's described on the Note, which seems like just one section of a township in

Imperial County. You're familiar with what's described on Exhibit A in --
A Which one is it? A?
Q A. The --
A A, alpha?
Q Yeah. A and C. The legal description of what Mr. Collins was supposed to take a --
A Sure.
Q -- collateral interest in.
A Okay. You're asking if I'm familiar with this?
Q Yeah.
A The document or the description?
Q No. No. I mean the project that Gibraltar was working which included that particular tract.
A Oh, yes, I do have some knowledge of it.
Q And what knowledge do you have of that?
A Well, first things first, they were trying to clear title by way of having Gateway LandAmerica do an extensive amount of research on the background of the property.
Q How do you know that? Were you involved in work --
A I did some leg --
Q -- with LandAmerica?
A I did some leg work in collecting deeds, moving people around, trying to get questions answered. Basic research.
Q Was that one of the projects you had is to --

A That was --
Q -- get some background?
A -- the third project. Yeah, I mentioned Jeramous Henderson and I had mentioned Freeport, Grand Bahamas. Part of the research that Lee Sheahy was doing, I helped with some leg work.
Q Okay. Now, we had a document, which I was -- that I think was admitted for the -- for state of mind. Let's look at Exhibit G, which has been admitted into evidence, I believe. And I think Manny spoke about this too. This letter is not addressed to you in any way. Right?
A It is not, no.
Q But is this consistent with what you're testifying here today that you personally were working on a project for Gibraltar among other things you were doing that concerned the acquisition of this parcel.
A Yes. The research that I was doing was directly involved with what is now pictured here as the result that they were able to get title insurance binders on all 14 townships.
Q Okay. As far as you believed in December of 2006 before Mr. Collins departed with his money, did Gibraltar have a financial interest in the subject property?
A They had a secured ownership interest and title insurance and I knew -- I was made to be aware both by Gibraltar and direct conversation with Lee Sheahy that this was imminent.

That they were --

Q Did Mac --

THE COURT: Mr. NewDelman, I'm sorry to interrupt your examination. I didn't understand the witness' answer. His answer is they had a secured ownership interest? I don't understand the answer.

THE WITNESS: Perhaps the word was misused. The question was, of course, whether they had clear title. And Lee Sheahy assured me that they did have clear title and that he would evidence that in writing, which he later did, by four days.

MR. COLLINS: Can I object to that, Your Honor.

THE COURT: Since I asked the question, I doubt it. But --

MR. COLLINS: Oh, I'm sorry.

THE COURT: -- you can -- no. No. Mr. Collins, you can certainly note your objection for the record. So tell me what your objection is. It's late in the day and I was a little too fast on that one.

MR. COLLINS: Okay.

THE COURT: So tell me what you'd like to object to.

MR. COLLINS: On that objection, because -- could you repeat that question again because I know --

THE COURT: My question that I wanted to understand the witness' answer. I think Mr. -- let's just see if we can

all spin this back. Because it's not a jury. That's may be the good and the bad.

MR. NEWDELMAN: I think he used a buzz word that got you concerned.

THE COURT: That is -- yeah.

MR. NEWDELMAN: That was secured.

THE COURT: But Mr. NewDelman's question goes to the witness' understanding of whether Gibraltar had an ownership interest in the land. Correct, Mr. NewDelman?

MR. NEWDELMAN: That's correct. What he knew.

THE COURT: And so it's about his state of mind. His answer and the questions are not to establish whether Gibraltar in fact owned the property.

MR. COLLINS: Oh, okay.

THE COURT: What -- but it's important. And if you have an objection, I want you to be able to make it. But the question is -- the whole thing that goes on here now is what did Mr. Rose understand at the time he signed the Note. And Mr. NewDelman's question is basically what, Mr. Rose, did you understand Gibraltar had with respect to this property at about the time you signed the Note. Correct?

MR. NEWDELMAN: Correct. Absolutely.

THE COURT: Okay. And he's telling us his understanding.

MR. COLLINS: Okay.

THE COURT: Based on apparently some work that he says he did with respect to clearing title. But what's confusing to me, Mr. NewDelman, and I'll just ask Mr. Rose straight out --

MR. NEWDELMAN: Sure, go ahead.

THE COURT: -- was it your understanding that they already had title to these properties or they were acquiring title?

THE WITNESS: My understanding was that they had a deed which represented title. And that Lee Sheahy was getting the title insurance.

THE COURT: All right. Thank you.

BY MR. NEWDELMAN:

Q Okay. Very good. So deed was there but insurance, they were still working --

A Pending.

Q -- on title insurance --

A Correct.

Q -- issue.

A Correct.

Q Okay. Now, involved in the transaction, I think it's clear to everybody here that you had no direct personal contact with Mr. Collins any time before the departing of his money on December 15th, '06. Correct?

A That is correct.

Q Okay. And did you make any representations at all, Mr. Rose, you, to their agent in any way regarding Gibraltar's ownership or entitlement to the property in question?
A I told Mac that I was completely clear that Gibraltar owned the property. That was my understanding at the time.
Q That was your understanding?
A Correct.
Q Okay. You have anything even subsequent to that to persuade you otherwise that they never did acquire the property? Do you have any knowledge of where the property sits even today?
A Absolutely not. And until Mr. Collins raised these questions, I had no idea there was a problem.
Q You were not there on December 14th?
A No.
Q Okay. And you didn't execute any deeds or deeds of trust, did you?
A No. No.
Q Ever intend to commit any type of fraud or misrepresentation to Mr. Rose -- or Mr. Collins? I'm sorry, Charlie.
A Absolutely not, no.
Q Okay. Now, I asked Manny a question, which I'm going to ask you. Because it's an issue that a lawyer's always interested in is why did you sign the Note?

A Well, first things first, that I believe Gibraltar would pay it back. In other words, their deal was going to go through, that they did in fact own the property. And they needed the money to fund their further research. But the money that he owed me, obviously, I was able to receive some money from this deal. And that was pending expenses that I put out on both Freeport, Grand Bahamas, on Jeramous Henderson, and so forth. So this was a way for me to get some of the money that I was owed, vis-a-vis taking a risk that I thought was a nil risk because Tony's deals were going to essentially pay everything back on time and this would be a non-event.
Q You had 100 percent complete confidence that Gibraltar would timely pay back this obligation when it became due?
A Absolutely because I certainly didn't have the wherewithal to pay it back myself. I made that clear to Mac at the time. That if it was up to me to pay it, that I would be basically completely in trouble because I couldn't.
Q Anyone ever ask you to transfer a deed like they did Gibraltar to Emmanuel and Emmanuel to Collins. You were never even at that meeting to partake in that, were you?
A I was never asked to transact any deeds, no.
Q Okay. Did you really have anything to do with the securing of the Note by any property?
A Other than my signature, no. No property whatsoever.
Q On the Note.

A Yeah. No property --
Q Right.
A -- whatsoever.
Q Right. Okay. You never represented to Mac McDaniel that you had any ownership interest in this property?
A Well, clearly I don't now, then or ever.
Q Okay.
A I have never have represented that to anybody.
Q Exhibit H, which is the -- no, not H. The cashier's check --
THE COURT: I.
THE WITNESS: That would be A.
BY MR. NEWDELMAN:
Q You got the cashier's check, Charlie? It's F.
A F.
Q The check's payable to Gibraltar. Correct?
A Yes, it is.
Q Okay. When did you first see this check?
A Actually, I believe the day that it was received by Mr. Thompson. We met at the bank. And he was able to disburse monies that he owed me for other jobs at that time.
Q So your testimony here today that you actually went to the bank with Thompson. Right?
A I watched him sign this Note, yeah -- this --
Q Okay. And there was a reason why you went to the bank

with Thompson?
A To make sure that I could be paid by the monies that were produced that I took the risk of my signature.
Q And that is Thompson's signature, is it not, as far as you know, on the back of the check?
A It does appear to be his signature, yes.
Q Okay. And as far as you know, was it -- did he sign it while you were -- in your presence?
A He signed it in front of me, yes.
Q Okay. And the critical question, how much money did you get from Gibraltar --
A I received as a -- essentially a deposit on Freeport and a partial payment on Jeramous Henderson, plus expenses of $25,000, round figure.
Q Was there any part of that that was associated with the Collins' money for --
A As a --
Q -- for work you did or your accommodating status of signing this promissory note?
A Yeah. I mean, I think in my own mind, perhaps not in anybody else's, I was hoping that was to be something against the hard work that I put in, just the leg work driving around.
Q So you did receive 25,000, but it was also for --
A I received 25 --
Q -- other work you did for or you had done for Gibraltar?

A Correct.
Q Okay. Any reason why there was no work done for Gibraltar after December 14th, '06?
A I got a great phone call from a friend of mine to go to Houston, Texas, and that's kind of where --
Q I didn't hear you.
A I got an opportunity in Houston, Texas as of late of '08. And that consumed a lot of my time.
Q Got it.
A In '07, I worked in Tahoe. And that was it.
Q Okay. And you plan to pay back Mr. Collins, do you not, pursuant to where he fits in the classification of creditors within your Chapter 11?
A Yes.
Q And he would have every right to vote for or against the treatment of his obligation in your Chapter 11 case. Right?
A That is correct.
Q Okay.
MR. NEWDELMAN: I have no further questions.
THE COURT: Mr. Rose, what's the distribution to the general unsecured -- your creditors under your plan, do you know?
THE WITNESS: One more time, Your Honor.
THE COURT: What percentage will the general unsecured creditors receive under your plan?

THE WITNESS: I have not a clue at this point. I haven't had a chance to read it all.

MR. NEWDELMAN: You probably have given us apology (sic). I think the yield to unsecured creditors based on projected supposed income and I'm just talking off -- looking at it a couple of nights ago for the case here. I think there might be about $14,000 there. Plus we've got child support we have to clean up. Plus arrearages on the house. I think this claim is -- within my general group of unsecured creditors. It's not a big yield.

THE COURT: Tell me what the percentage --

MR. NEWDELMAN: It's not a big yield.

THE COURT: It's not a big yield, Mr. NewDelman?

MR. NEWDELMAN: Excuse me?

THE COURT: Not a big yield?

MR. NEWDELMAN: Not a big yield. It's a five-year, you know --

THE COURT: Under five percent, Mr. NewDelman?

MR. NEWDELMAN: I couldn't tell you. I would have to look at the actual allowed claims to see what we have because it was a bar date.

THE COURT: Okay.

MR. NEWDELMAN: But his rights would be to vote. And, of course, I got to get --

THE COURT: Mr. NewDelman, it's not a requested time

for arguments.

MR. NEWDELMAN: That's not today's issues as far as a 523 --

THE COURT: Mr. Collins, any cross-examination (sic) of the witness?

MR. COLLINS: Yes, ma'am, I have a few questions.

THE COURT: Absolutely.

REDIRECT EXAMINATION

BY MR. COLLINS:

Q Mr. Rose, at what point in time did my money go to an investment?

A I was not aware that there was any investment involved.

Q Why would you sign a promissory note to me if you were not clear on the given collateral?

A I was clear on the collateral at the time.

Q At what point in time did my money go to an investment if you and Illuminardi received money, over 45,000 of my money?

A Again, to repeat myself, I was never aware that there was an investment involved.

Q What documents do you have -- do you have any current documentation to show that the property is titled Gibraltar Properties?

A Only what's on the public record.

Q Why did you sign a Note without full confirmation that they own the title and a current deed or a current title

search?

A To my knowledge, that's exactly what they did have.

Q Why did you sign a Note that you were not sure whether or not you had the ability to pay it back?

A Because Gibraltar had assured everybody that their deal imminent and that it was more than adequate to repay the loan in full.

Q Why did you sign a Note describing real property if you were not clear about ownership?

A As again I have said, I was clear at the time that Gibraltar owned the property.

Q Is there anything on the promissory note, verbal, said you are to receive my money?

A The promissory note specifies that I was responsible for your money. There's nothing on there that said I would receive it.

MR. COLLINS: That's it, Your Honor.

MR. NEWDELMAN: Your Honor, I have one question.

THE COURT: Mr. NewDelman.

RECROSS-EXAMINATION

BY MR. NEWDELMAN:

Q As a result of Mr. Collins' question, Charlie, look at Exhibit I.

A Exhibit I.

Q I, in evidence. You got I?

A I sure do.
Q Okay. And Manny already testified to that. The date in which that appears to be notarized, what's the date it appears to be notarized?
A December 11th, 2006.
Q That's a couple days before the transaction. Correct?
A That is correct.
Q And are you aware that -- well, New Hope is Rudd, because it says Rudd is the trustee of New Hope. Is that correct?
A That is correct.
Q And that is a deed, for whatever it means, what is means, to Gibraltar. Is that correct?
A That is correct.
Q Okay. And that includes the subject property?
A It does, yes.
Q Okay. And I do want to point out to you, Mr. Rose, that although the document was apparently was signed -- and it's hard to read Mr. Rudd's signature because I know he was probably frail -- but I can't tell exactly the date. It's there. But it is sometime -- it could be the same day because it says 11/06. See the scribble for the date that Mr. Rudd would have entered?
A That is exactly his signature. And it does say 12/11/06. So --
Q Okay. But the recording of that, though, the recording on

the top, is January 18th of '07. Do you see that?
A I see that.
Q Okay. Do you have any knowledge on why there this amount of -- or five-, six-week delay in the recording of that document?
A Per my question to Mr. Thompson on that very issue, he said he wanted to be sure that title insurance was in place before he recorded the deed.
Q Got it. Is that consistent, then, with the letter from LandAmerica that they basically have the binders ready to go and it's a done deal, but they're just going to wait until they can issue the title policy.
A That is correct.
Q Okay. So on December 12th, this is the information, as well as your own investigation, that you were relying on?
A Yes, this is the entirety of it, yes.
Q And as far as you know, Gibraltar had legal title to the property on the date that you signed the promissory note in favor of Mr. Collins. Is that correct?
A That is correct.
MR. NEWDELMAN: No further questions.
THE COURT: You may step down, Mr. Rose.
MR. COLLINS: Your Honor, I have one more question. And that's it for me.
THE COURT: All right, Mr. Collins. You may not step

down, Mr. Rose.

FURTHER REDIRECT EXAMINATION

BY MR. COLLINS:

Q Mr. Rose, to your knowledge --

MR. COLLINS: Ma'am, I'm referring back to Exhibit 4, Page 9 of 11.

THE COURT: Okay. Let the witness get there.

THE WITNESS: Page 9 and 11 or 9 of 11.

BY MR. COLLINS:

Q 9 of 11, Exhibit 12.

A Okay. Hang on. Let me get there.

Q Exhibit 4.

THE COURT: All right. Let's get there.

THE WITNESS: All right. Go ahead.

THE COURT: Let's get there. Exhibit 4. This is the cease and desist.

BY MR. COLLINS:

Q And this is the paper that you have never seen before?

A Never seen this before.

Q You've never seen this? This is public record.

MR. COLLINS: I would like to -- Your Honor, it's already been entered, but this right here --

MR. NEWDELMAN: Not public record.

THE WITNESS: This was never provided to me.

MR. NEWDELMAN: Not public record.

MR. COLLINS: It was documented with the documented with the county recorder, ma'am, stipulating a letter to Derrick Fincher, Charlie Rose, and Anthony Thompson.

THE COURT: Mr. Collins, I've admitted Exhibit 4 as a publicly-recorded document.

MR. COLLINS: Yes --

THE COURT: All that tells me is that this was attached to a deed that was publicly -- part of the public record and recorded on 3/27/2007. Correct? You want to bring to my attention that this Page 9 of 11 is included in whatever was recorded on 3/27/2007. Correct?

MR. COLLINS: Yes, ma'am. October 23rd, 2006.

THE COURT: No, sir. It wasn't --

MR. COLLINS: Oh.

THE COURT: -- recorded on that day.

MR. COLLINS: Oh, okay.

THE COURT: It's dated that day.

MR. COLLINS: Yes.

THE COURT: But it wasn't recorded that day.

MR. COLLINS: Yes.

THE COURT: It's included in the public record as of 2007.

MR. COLLINS: Yes.

THE COURT: All right. Good enough. Mr. Rose, you are excused.

THE WITNESS: Thank you.

THE COURT: All right.

Ladies and gentlemen, it's been a long and difficult afternoon. I think Mr. and Mrs. Collins have done an excellent of presenting their case. And I know that Ms. Collins had a great deal of frustration that she was not able to do it directly. But --

MR. COLLINS: That's okay.

THE COURT: -- I think she did -- I think you both did a nice job.

I'm going to take it under advisement. I'm not going to rule from the Bench. What I started to say before is what I still believe now, the issue in front of me that I have to decide after I review all of the exhibits that have been admitted and I'll review the testimony, is whether at the time Mr. Rose signed the Note, he made a false representation. And if he did, then the debt will be non-dischargeable. If he did, the debt will be dischargeable. But that doesn't mean that isn't still due. And Mr. NewDelman has made a point that I'm going to now emphasize to both of you, no matter what happens with this debt, if it's non-dischargeable, it just means it can't be disposed of by payments under the plan. But you should be paying attention to the plan and the treatment under the plan. You should make sure you assert your rights in the plan, including the right to vote or your right to object to

the plan, because --

MR. COLLINS: By the debt being so big and large, ma'am, do we go to more or less, like, the head of the payment plan or do we go at the bottom --

THE COURT: Well, again, Mr. Collins --

MR. COLLINS: -- of the payment --

THE COURT: -- I can't give you legal advice. I believe what is in front of us on the record is that you're being treated as a general unsecured creditor. That is not the head of the line.

MR. COLLINS: Yes, ma'am.

THE COURT: So I just urge you to consider your rights as a general creditor as well as any rights you may have if I determine the debt is non-dischargeable.

Now, when I decide to take something under advisement, it means that I have to write a written decision. I told you I'd try to have it out in 60 days. And I will try to have it out in 60 days. But I'm not going to promise because, as you can see, things are kind of busy here these days. And it always takes longer to write something than to say something.

Mr. NewDelman, thank you for your patience. It's difficult for lawyers when they don't have lawyers on the other side. And it's difficult for people who are not represented to deal with lawyers. I think everybody stayed polite and

professional and I appreciate it.

MR. COLLINS: Thank you.

THE COURT: All right. We're adjourned for today.

(Proceedings Concluded)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: June 9, 2010

Kelley Grijalva

AVTranz, Inc.
845 North Third Avenue
Phoenix, AZ 85003